UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HUGH KNIGHT, WAYNE STEWART, and
SHANNON DICKINSON, *on behalf of
themselves and all others similarly situated*,

                                    Plaintiffs,

            v.

CARL KOENIGSMANN, *et al.*,

                                    Defendants.

No. 18-CV-7172 (KMK)

OPINION & ORDER

Appearances:

Amy J. Agnew, Esq.
Law Office of Amy Jane Agnew, P.C.
New York, NY
*Counsel for Plaintiffs*

Andrew S. Amer, Esq.
Colleen K. Faherty, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Hugh Knight ("Knight"), Wayne Stewart ("Stewart"), and Shannon Dickinson

("Dickinson") (collectively, "Plaintiffs") are inmates in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS") who require intermittent

catheterization. (Second Am. Compl. ("SAC") ¶¶ 10, 17, 22 (Dkt. No. 82).) Plaintiffs bring this

Action, pursuant to 42 U.S.C. § 1983, on behalf of themselves and all others similarly situated,

and name as Defendants a host of DOCCS medical officials: Chief Medical Officer Carl

Koenigsmann ("Dr. Koenigsmann"); Regional Medical Directors Susan Mueller ("Dr. Mueller"),

David S. Dinello ("Dr. Dinello"), Paula Bozer ("Dr. Bozer"), and John Hammer ("Dr. Hammer"); Shawangunk Correctional Facility Health Services Director ("FHSD") Chung Lee ("Dr. Lee"); 54 John Doe FHSDs; and 15 John Doe Regional Health Services Administrators (collectively, "Defendants"). (*Id.* ¶¶ 29–36.) Plaintiffs allege that Defendants maintain and enforce a policy that unlawfully restricts the catheters and related supplies provided to Plaintiffs, in violation of the Eighth Amendment. (*Id.* ¶¶ 244, 258.) Plaintiffs also allege that, when they have suffered catheter-related infections and injuries, Defendants have delayed medical treatment, also in violation of the Eighth Amendment. (*Id.* ¶ 253.)

Before the Court are three motions: Defendants' Motion To Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), (Dkt. No. 83), Plaintiffs' Motion for Pre-Certification Discovery, (Dkt. No. 86), and Plaintiffs' Cross-Motion To Amend, (Dkt. No. 92). For the reasons that follow, Defendants' Motion To Dismiss is granted in part and denied in part. Plaintiffs' Motion for Pre-Certification Discovery is denied without prejudice to renew. Plaintiffs' Cross-Motion To Amend is granted.

## I.  Background

### A.  Factual History

The following allegations are drawn from the Second Amended Complaint and are taken as true for purposes of resolving the instant Motions. The Court recounts only those allegations relevant for consideration of the instant Motions.

#### 1.  The Parties

Plaintiffs are DOCCS inmates, all paraplegics and largely wheelchair-bound, who do not have control over their bladder function and thus require "intermittent catherization," that is, "the insertion and removal of a catheter several times a day to empty the bladder." (SAC 1

(preliminary statement); *see also id.* ¶¶ 5–6, 8–10, 13–17, 20–22.)  Plaintiffs require a "steady

supply" of catheters — "at least 4 to 6 catheters per day" — and "must also be able to clean

[their] hands and body parts in order to avoid bacterial transfer that can develop into" urinary

tract infections ("UTIs").  (*Id.* ¶¶ 11–12, 18–19, 23–24.)

Defendants are various DOCCS medical officials.  Dr. Koenigsmann, the Chief Medical

Officer ("CMO"), was "the ultimate arbiter of medical policy for DOCCS" who "makes

decisions that directly impact the health care of individual patients."  (*Id.* ¶¶ 37–38.)[1]  Drs.

Dinello, Bozer, Hammer, and Mueller, all DOCCS Regional Medical Directors ("RMDs"), are in

charge of "a group of correctional facilities" and "are responsible," along with the CMO, "for

crafting policies and procedures for medical treatment of" DOCCS inmates, for "developing and

regularly updating clinical practice guidelines . . . to stay current with . . . community standards

of treatment," for "personally review[ing] all emergency room . . . trips by [inmates]," and for

"personally review[ing] and approv[ing] or deny[ing] recommendations from facility physicians

for [inmates] to see certain specialists, including urologists."  (*Id.* ¶¶ 39–42, 45.)  The 15 John

Doe Regional Health Services Administrators ("RHSAs") are responsible for investigating and

responding to inmates' health-related complaints, and must "ensure [that inmates] receiv[e]

medi[c]al care that comports with community standards."  (*Id.* ¶¶ 55–61.)  And Dr. Lee and the

54 John Doe Facility Health Services Directors ("FHSDs") are treating physicians stationed at

DOCCS facilities who are responsible for "examining [inmates] during sick call and responding

to medical complaints," for "sending [inmates] to . . . testing," for "prescribing anti-infective and

antibiotic medications," for "issuing [r]eferrals . . . to outside specialists," for "review[ing] the

---

[1] The current acting DOCCS CMO is John Morley, whom the Plaintiffs seek to add as a Defendant.  (*See* Mem. of Law in Opp'n to Mot. & in Supp. of Cross-Mot. ("Pls.' Mem.") 1, 24 (Dkt. No. 94).)

recommendations and reports of the specialist[s]," and for "prescribing specialist-recommended medications and supplies." (*Id.* ¶¶ 64–70, 73–78.) The CMO, RMDs, and RHSAs all have access to inmates' "FHS1" medical records, which include a description and history of, among other things, inmates' medical issues, prescriptions, referral history, and non-formulary requests. (*Id.* ¶¶ 43–44, 60.) Plaintiffs do not allege that the FHSDs have such access.

### 2. Alleged Standard of Care

Plaintiffs allege that "[t]he current standard of care in the urological community is that [inmates] who require intermittent self-catheterization must be supplied with sterile, single-use catheters with adequate supplies to ensure sterility." (*Id.* ¶ 71.) Plaintiffs also allege that inmates requiring intermittent self-catheterization "should lubricate a catheter at least three inches up the catheter" prior to insertion. (*Id.* ¶ 85.)[2]

In support, Plaintiffs allege that several government agencies have endorsed this standard of care. (*Id.* ¶¶ 104–08.)[3] Plaintiffs also allege that "a number of outside specialists, including urologists," have "recommended [to Defendants] that [Plaintiffs] receive sterile, single-use

---

[2] Plaintiffs further allege that the current standard of care replaces an older standard that was based on a "scientifically inadequate article published in 1972," which "allowed rewashing of catheters within the relatively clean environment of patients' homes," and which has since been debunked. (SAC ¶¶ 98–103.)

[3] In particular, Plaintiffs allege that, in 2007, the Veterans Administration recommended "that clinicians should follow the manufacturer's instructions for catheter use[,] which recommend that single-use catheters should not be re-used in any setting," and further "recommended that patients should be provided with an adequate number of catheters to allow the use of a sterile catheter for each catheterization," (SAC ¶¶ 104–05); that the Centers for Medicare and Medicaid Services "have refused to issue a recommendation for the re-use of catheters," (*id.* ¶ 106); that, in 2008, "Medicare changed its policy for intermittent catheterization and recognized single-use catheters as single-use devices" in an effort to "reduce the frequency of UTIs," (*id.* ¶ 107); and that, in 2009, the Center for Disease Control "refused recommendation for re-washing of catheters, saying 'further research is needed on optimal cleaning and storage methods,'" (*id.* ¶ 108).

catheters." (*Id.* ¶ 72.)  Plaintiffs further allege that in 2005, in connection with a lawsuit filed in

the Western District of New York, a medical expert retained by DOCCS "declared . . . that the

rewashing of catheters was [the] standard of care if a patient did not have a history of [UTIs]

during the last two years nor medical conditions that would require the use of sterile

catheterizations," thus demonstrating that DOCCS — and, in particular, Drs. Koenigsmann and

Dinello — has long been aware that inmates "who suffer from recurrent UTIs" should not be

required to re-use catheters.  (*Id.* ¶¶ 113–15, 118–20 (emphasis, quotation marks, and alterations

omitted) (citing *Shariff v. Goord*, No. 05-CV-6504 (W.D.N.Y.) (Dkt. No. 60, ¶ 14)).)  Finally,

Plaintiffs allege that the catheters provided to them state on their packaging: "Sterile in

unopened, undamaged package.  Single use only. . . . Rx only."  (*Id.* ¶ 111.)

### 3.  Alleged Deviations from the Standard of Care and Resulting Harm

Plaintiffs allege that, given the standard of care, they require "at least 4 to 6 catheters" per

day, as well as sufficient lubricant for "15–21 inches of catheters."  (*Id.* ¶¶ 11–12, 18–19, 23–24,

85.)  However, despite the standard of care, the catheter packaging, and the specialists'

recommendations to the Defendant FHSDs, Plaintiffs allege that Defendants, and in particular

Dr. Lee, (*id.* ¶ 160), "ignore the standards of care" and continue to "enforce DOCCS'[]

discredited, unsafe single-use catheter re-use policy," (*id.* ¶ 73), and do not provide Plaintiffs

with "an adequate number of single-use catheters per day[,] nor adequate supplies," including

lubricant, "to effectively clean their genital area and hands before insertion," (*id.* ¶¶ 83–84).

Plaintiffs receive only "two . . . 3 gram packages of lubricant per day," thus causing them to

"apply[] much less lubricant than they should."  (*Id.* ¶¶ 84, 128, 201.)

As a result of Defendants' conduct, Plaintiffs have "acquire[d] preventable" and often

"severe" UTIs — "an infection of the urinary system" that can "cause painful urination, pressure,

pain[,] or spasms in the back or lower abdomen, chills, fatigue, fever, and vomiting," and which can "sometimes manifest into higher-risk and potentially lethal infections." (*Id.* ¶¶ 89–95, 135, 137–41.) Plaintiffs have also suffered "permanent kidney damage." (*Id.* ¶ 136.) Further, Plaintiffs allege that the Defendant FHSDs "rarely prescribe timely urinalysis testing and treatment," causing Plaintiffs to "wait days and even weeks for testing and treatment once they start complaining of symptoms of a UTI." (*Id.* ¶¶ 79–80.) These delays in treatment "occur[] despite Defendant [FHSDs'] awareness of [Plaintiffs'] medical histories . . . [and] elevated risk of suffering from UTIs." (*Id.* ¶ 81.)

In particular, Plaintiff Knight alleges that, although he "must catheterize himself approximately four to six times a day," he has for years, including while presently incarcerated at Shawangunk Correctional Facility ("Shawangunk"), been provided with only one catheter per day and two 3-gram packages of lubricant per day. (*Id.* ¶¶ 5, 126–29.) Knight thus "attempts to clean his . . . catheter[s] with regular soap and water" and a washcloth replaced once weekly, which is "an inadequate alternative to proper sterilization or a new, sterile catheter." (*Id.* ¶¶ 132–33.) As a result, Knight "has suffered from several very severe UTIs," "resulting infections," and "permanent kidney damage." (*Id.* ¶¶ 136–37.) In particular, Knight points to two examples, in May and July 2018, in which he was admitted to the emergency room due to a "high fever from a UTI" and ultimately requiring six and seven days of hospitalization, respectively. (*Id.* ¶¶ 138–40.) After the latter hospital stay, a urologist recommended that Knight "receive 6 new, sterile catheters per day — not reused ones." (*Id.* ¶ 142.) Defendant Dr. Lee, having received this recommendation, briefly "ordered Mr. Knight 4 catheters per day," thus increasing his supply but effectively continuing, contrary to the urologist's conclusion and the standard of care, to require Knight re-use at least some catheters. (*Id.* ¶¶ 143–44.) Moreover, the increase lasted

for only three days, after which Knight again received only one catheter per day. (*Id.* ¶¶ 145–46.) In October 2018, Knight complained to Dr. Lee to request six catheters per day, but his prescription was not changed. (*Id.* ¶¶ 147–48.) Knight also filed multiple "grievances regarding the inadequate supply of catheters," but his prescription has not changed. (*Id.* ¶¶ 130–31.)

Plaintiff Stewart makes substantially similar allegations. He alleges that, since he has been incarcerated at Shawangunk, Dr. Lee has prescribed him "three single-use catheters per day, which is not enough to safely address his medical needs" and which "force[s] him to try and clean one or two of his daily . . . catheters with whatever soap and water are available to him in his cell." (*Id.* ¶¶ 13, 152–53.) However, "the water is not hot enough to allow sufficient cleanliness, the soap is not antibacterial[,] and many elements of the catheter, including the tubing, cannot be sufficiently cleaned without submersion in sterilizing fluid." (*Id.* ¶ 154.) Nor does "DOCCS . . . provide Mr. Stewart with gloves or other medical supplies to ensure the sterility of his hands and body parts when handling and inserting the catheter." (*Id.* ¶ 161.) As a result, Stewart "has contracted several UTIs." (*Id.* ¶ 157.) The "pain from the UTI was often so unbearable that he could not sit in his wheelchair and he had to remain bedridden." (*Id.* ¶¶ 164, 168.) However, in at least one case of a UTI, "medical personnel did not run a test until thirty . . . days after [Stewart's] initial complaint[,] despite knowing that UTIs require immediate treatment and, left untreated, can lead to serious medical complications. (*Id.* ¶¶ 162, 166.) Stewart has requested that Dr Lee increase his daily catheter supply, (*id.* ¶ 158), and has filed grievances on the issue, (*id.* ¶ 159), but no change has occurred, (*id.* ¶ 152).

Finally, Plaintiff Dickinson alleges that, while housed at Shawangunk, he received three single-use catheters per day. (*Id.* ¶¶ 20, 174.) Dickinson complained and filed grievances about the inadequate supply of catheters, but Dr. Lee "refused to increase" the supply. (*Id.* ¶¶ 177–78.)

Between February 2017 and April 2018, Dickinson contracted several UTIs, some of which were severe and required hospitalization. (*Id.* ¶¶ 181–84, 199.) In each case, medical personnel delayed testing for and treating the UTI for days or weeks. (*Id.*) Further, in January 2018, "[w]hile attempting to self-catheterize himself with inadequate lubricant and a dirty, re-used catheter, Mr. Dickinson injured the skin on his penis," ultimately requiring seven days of hospitalization for "penile cellulitis, an acute urological condition caused by infection." (*Id.* ¶¶ 189–92.) The "treating urologist" at the hospital "recommended that [Dickinson] cease re-washing single-use catheters and use a sterile catheter each and every time he self-catheterizes." (*Id.* ¶ 193.) Notwithstanding this recommendation, Dr. Lee, without conducting an individualized examination of Dickinson, "decreased" his prescription to two catheters per day. (*Id.* ¶¶ 196–97.) Dickinson was later transferred to Green Haven Correctional Facility ("Green Haven"), where, despite his two-catheter-per-day prescription, he received only one catheter per day. (*Id.* ¶¶ 201–04.) Dickinson filed a grievance at Green Haven, but was "told [that] one catheter per day 'is the policy.'" (*Id.* ¶ 205.) Dickinson thereafter contracted another UTI, and complained to medical staff about the pain on July 18, 2018, but was not tested and treated until August 9, 2018. (*Id.* ¶¶ 206–10.) The treating doctor stated that Dickinson's practice of re-washing his catheters was "preposterous." (*Id.* ¶ 211.) The pain from the UTI continued and, on October 31, 2018, Dickinson received a cystoscopy, which showed that the catheterizations had caused "urethral stricture" (the "narrowing of the urethra") and "false passage[s]" (in which "the catheter forces through the urethra, causing . . . internal trauma"). (*Id.* ¶¶ 87, 213–14.) Dickinson was prescribed (by a non-defendant doctor) medication "to attempt to prevent the development of UTIs" and was further advised by that doctor (who "has no authority to demand the supply of adequate catheters within DOCCS") that he receive "5–7 sterile, single-use

catheters per day."  (*Id.* ¶ 215.)  However, Defendant FHSDs "refuse[] to prescribe him an adequate supply of sterile, single-use catheters and supplies," causing him continued pain.  (*Id.* ¶¶ 218–19.)

### 4.  Causes of Action

Plaintiffs bring three Eighth Amendment claims pursuant to 42 U.S.C. §1983.  The first cause of action alleges that Defendants exhibited deliberate indifference to Plaintiffs' health by "adopt[ing] and implement[ing] a policy which restricts the number of sterile, single-use catheters to the bare minimum and demands patients rewash catheters," and by "allow[ing] the deprivation of an adequate number of sterile catheters despite knowing that patients suffer from UTIs and hospitalizations as a result of infections from unsterile catheterizations."  (*Id.* ¶ 244.) The second alleges that Defendants exhibited deliberate indifference to Plaintiffs' health by delaying treatment of UTIs by "days if not weeks."  (*Id.* ¶ 253.)  The third, much like the first, alleges that Defendants denied Plaintiffs adequate medical care by "fail[ing] to provide five to seven sterile, single-use catheters."  (*Id.* ¶ 258.)[4]

### B.  Procedural History

The initial Complaint was filed on August 10, 2018.  (Compl. (Dkt. No. 9).)  The First Amended Complaint was filed on November 21, 2018.  (First Am. Compl. ("FAC") (Dkt. No. 64.)  The Court held a conference on December 17, 2018, at which it permitted Plaintiffs to amend a second time and indicated that any future amendment would be subject to dismissal with prejudice.  (*See* Dkt. (entry for Dec. 17, 2018); Letter from Amy Jane Agnew, Esq. to Court

---

[4] Plaintiffs also bring suit on behalf of a putative class of "all present and future prisoners and detainees with bladder function disabilities who are or will be housed in New York State Correctional Facilities and require intermittent self-catheterization to empty their bladders." (SAC ¶ 220.)

(Dkt. No. 70).)  The instant Second Amended Complaint was filed on February 8, 2019.  (Dkt. No. 82.)

On January 22, 2019, the Court approved a schedule for simultaneous briefing of Defendants' Motion To Dismiss and Plaintiffs' Motion for Pre-Certification Discovery.  (Dkt. No. 78.)  The Parties did not request, and the Court did not approve, briefing on Plaintiffs' Cross-Motion To Amend.

Defendants' Motion To Dismiss was filed on February 22, 2019.  (Not. of Mot. (Dkt. No. 83); Decl. of Andrew Amer, Esq. in Supp. of Mot. (Dkt. No. 84); Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 85).)  Plaintiffs' combined opposition to the Motion To Dismiss and Cross-Motion To Amend was filed on March 22, 2019.  (Not. of Cross-Mot. (Dkt. No. 92); Decl. of Amy Jane Agnew, Esq. in Opp'n to Mot. & in Supp. of Cross-Mot. (Dkt. No. 93); Mem. of Law in Opp'n to Mot. & in Supp. of Cross-Mot. ("Pls.' Mem.") (Dkt. No. 94).)  Defendants' reply was filed on April 12, 2019, (Reply Mem. of Law in Supp. of Mot. ("Defs.' Reply") (Dkt. No. 98)), as was their own opposition to the Cross-Motion, (Mem. of Law in Opp'n to Cross-Mot. ("Defs.' Opp'n") (Dkt. No. 99)).

Plaintiffs' Motion for Pre-Certification Discovery was filed on February 22, 2019.  (Not. of Mot. (Dkt. No. 86); Decl. of Amy Jane Agnew, Esq. in Supp. of Mot. (Dkt. No. 87); Mem. of Law in Supp. of Mot. (Dkt. No. 88).)  Defendants' opposition was filed on March 22, 2019.  (Mem. of Law in Opp'n to Mot. (Dkt. No. 91).)  Plaintiffs' reply documents were filed on April 12, 2019.  (Reply Aff. of Hugh Knight in Supp. of Mot. (Dkt. No. 100); Reply Aff. of Wayne Stewart in Supp. of Mot. (Dkt. No. 101); Reply Aff. of Amy Jane Agnew, Esq. in Supp. of Mot. (Dkt. No. 102); Reply Mem. of Law in Supp. of Mot. (Dkt. No. 103).)

A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery

for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted).

## B. Defendants' Motion To Dismiss

In their first and third causes of action, Plaintiffs allege that Defendants maintain and enforce a catheter distribution policy that violates Plaintiffs' Eighth Amendment rights. (SAC ¶¶ 244, 258.) In their second cause of action, Plaintiffs allege that, when they have suffered catheter-related infections and injuries, Defendants have unlawfully delayed medical treatment for "days if not weeks," also in violation of the Eighth Amendment. (*Id.* ¶ 253.)

Defendants seek dismissal of the first and third causes of action on grounds that the alleged policy comports with the current standard of care. (Defs.' Mem 13–19.) Defendants seek dismissal of the second cause of action on grounds that Plaintiffs fail to allege facts plausibly suggesting deliberate indifference. (*Id.* at 19–22.) Defendants also argue that Plaintiffs fail to allege the personal involvement of the RMD Defendants and Dr. Lee in any constitutional violation, that Defendants are entitled to qualified immunity, and that Plaintiffs' request for

injunctive relief must be dismissed because Plaintiffs fail to assert "official capacity" claims. (*Id.* at 22–25.)

The Court addresses each argument separately to the extent necessary.

### 1. Applicable Law

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). An inmate's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment because it is an allegation that "conditions of confinement [are] a form of punishment" and thus is a "violation of [the] Eighth Amendment right to be free from cruel and unusual punishments." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). To state a deliberate indifference claim, an inmate must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that the defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).

The first element is "objective" and requires the plaintiff show that the "alleged deprivation of adequate medical care [is] sufficiently serious." *Spavone*, 719 F.3d at 138 (citation and quotation marks omitted). In other words, the plaintiff "must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citation omitted). Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*,

467 F.3d 263, 279–80 (2d Cir. 2006) (citations omitted). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has offered the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Id.* (citation and quotation marks omitted).

The second element, which goes to mental state, requires the plaintiff show that prison officials were "subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138 (citation omitted). This means that the official must have "appreciate[d] the risk to which a prisoner was subjected," and have had a "subjective awareness of the harmfulness associated with those conditions." *Darnell*, 849 F.3d at 35; *see also Nielsen*, 746 F.3d at 63 ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (citation and quotation marks omitted)). In other words, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280 (citation and quotation marks omitted). An official's awareness of the risk of serious harm can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). However, "mere negligence" is insufficient to state a claim for deliberate indifference. *Walker*, 717 F.3d at 125

(quoting *Farmer*, 511 U.S. at 835). Neither does "mere disagreement over the proper treatment . . . create a constitutional claim"; "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

### 2. Analysis — Personal Involvement of RMD Defendants and Dr. Lee

Defendants argue that Plaintiffs fail to allege the personal involvement of the RMD Defendants or Dr. Lee in any constitutional violation. (Defs.' Mem. 18, 20.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (citation, italics, and quotation marks omitted). In other words, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Therefore, a plaintiff must plausibly allege that a defendant's actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Defendants argue that, because Plaintiffs allege that Dr. Koenigsmann, as CMO, is "the

ultimate arbiter of medical policy" for DOCCS, Plaintiffs necessarily "concede" that neither the

RMD Defendants (Drs. Mueller, Dinello, Bozer, and Hammer) nor the named FHSD Defendant

(Dr. Lee) "has the final say as to what medical policies DOCCS will implement," and,

accordingly, that these Defendants were not personally involved any constitutional violation.

(Defs.' Mem. 19 (citing SAC ¶ 37).)

As an initial matter, it is clear that Plaintiffs have established the personal involvement of

Dr. Lee. As Plaintiffs argue, (*see* Pls.' Mem. 19), Dr. Lee is alleged to have (1) received the

recommendation of Knight's urologist that he required 6 catheters per day, yet only increased his

supply to four catheters per day, and only did so temporarily, after which the supply was again

reduced to three per day, (SAC ¶¶ 143–47); (2) provided Stewart with only three catheters per

day even after Stewart complained to him that this was insufficient, (*id.* ¶¶ 152, 158–60); and

(3) "refused" to increase Dickinson's supply of catheters after he complained that the supply was

insufficient, and indeed later "decreased" his supply, (*id.* ¶¶ 177–78, 196–97). Thus, Dr. Lee is

alleged to have "participated directly" in the enforcement of the alleged catheter policy. *Grullon*,

720 F.3d at 139; *see also Cooper v. Baldwin*, No. 18-CV-2074, 2019 WL 113727, at *3 (S.D. Ill.

Jan. 4, 2019) (holding personal involvement established where the defendants were allegedly

"responsible for implementing policies pertaining to accommodations for disabled prisoners" and

"refused to provide [the plaintiff] with an adequate supply of sterile catheters").

The RMDs, however, are a different story. Although Plaintiffs name three of the RMDs

— Drs. Mueller, Bozer, and Hammer — in the Second Amended Complaint's caption and

preliminary statement, (SAC 1–2), and generally describe the duties of the position of RMD, (*id.*

¶¶ 30–33, 39–40), Plaintiffs allege no facts connecting Drs. Mueller, Bozer, or Hammer to the

substantive allegations at issue. *See Boykin v. Moreno*, No. 17-CV-6869, 2019 WL 1367606, at

*4 (S.D.N.Y. Mar. 26, 2019) (collecting cases for the proposition that personal involvement is

not established where a plaintiff merely names defendants in the caption but fails to "connect

them to the substantive allegations raised therein").  Although there are some allegations

regarding RMDs in general — for example, that "RMDs personally review and approve or deny

recommendations from facility physicians for patients to see certain specialists, including

urologists" and thus have "personal knowledge" of Plaintiffs' medical history, (SAC ¶¶ 45, 50)

— these allegations do not go to the named RMDs and, in any event, "[a] complaint that lumps

. . . defendants together . . . and provides no factual basis to distinguish their conduct fails to

satisfy [Rule 8]." *Tracey v. City of Geneva*, No. 17-CV-6567, 2018 WL 1509355, at *3

(W.D.N.Y. Mar. 26, 2018) (citations, quotation marks, and alterations omitted); *see also Carno

v. United States*, No. 17-CV-7998, 2019 WL 2287966, at *12 (S.D.N.Y. May 28, 2019) ("While

the Complaint indicates that there were three individuals involved in [the plaintiff's] treatment,

there are simply no allegations that the named individual defendants . . . even participated in

[his] treatment . . . ." (italics omitted)); *Leneau v. Ponte*, No. 16-CV-776, 2018 WL 566456, at

*15 (S.D.N.Y. Jan. 25, 2018) ("[C]omplaints that rely on group pleading and fail to differentiate

as to which defendant was involved in the alleged unlawful conduct are insufficient to state a

claim." (citations and quotation marks omitted)).  Plaintiffs thus fail to allege the personal

involvement of three of the named RMDs — Drs. Mueller, Bozer, and Hammer — in any

constitutional violation.

        As to the fourth named RMD, Dr. Dinello, Plaintiffs raise the additional allegation that,

given Dr. Dinello's involvement in the prior *Shariff* litigation — in which he "personally agreed

[in 2005] to and approved the provision of five . . . sterile, single-use catheters per day to each

plaintiff class member in Five Points who requires intermittent catheterization" — he is "acutely

aware that the current standard of care does not allow re-washing catheters." (SAC ¶¶ 118–20.)

This sole allegation, however, suggests only that Dr. Dinello had personal involvement over a

decade ago with the catheter policy at Five Points Correctional Facility; it does not suggest that

Dr. Dinello presently has (or has recently had) any personal involvement in enforcing the

catheter policy at Shawangunk and Green Haven, the facilities at which Plaintiffs reside. Nor do

Plaintiffs otherwise allege facts suggesting that Dr. Dinello "somehow permitted" the alleged

catheter policy to continue, that Dr. Dinello was involved in the alleged delay in Plaintiffs'

medical care, or that Dr. Dinello had any other connection with the substantive allegations at

issue in *this* case. *Falls v. Pitt*, No. 16-CV-8863, 2018 WL 3768036, at *6 (S.D.N.Y. Aug. 8,

2018); *see also Brown v. Montone*, No. 17-CV-4618, 2018 WL 2976023, at *3 (S.D.N.Y. June

13, 2018) (holding personal involvement not established where there were "no allegations

whatsoever that [the defendant] was involved in decisions regarding what medical care [the

plaintiff] received, or that he was aware of or somehow permitted [other defendants] to provide

allegedly inadequate medical care to [the plaintiff]"); *Lara-Grimaldi v. County of Putnam*, No.

17-CV-622, 2018 WL 1626348, at *11 (S.D.N.Y. Mar. 29, 2018) (holding personal involvement

not established where the "[c]omplaint contain[ed] no allegations whatsoever that [the

defendant] was involved in . . . or somehow permitted" the alleged violation). Moreover,

Plaintiffs do "not plausibly allege that [Dr. Dinello] failed to act on information regarding the

allegedly unlawful conduct" at Shawangunk and Green Haven or "otherwise acted with gross

negligence." *Thomas v. DeCastro*, No. 14-CV-6409, 2018 WL 1322207, at *13 (S.D.N.Y. Mar.

13, 2018) (alterations and quotation marks omitted). Nor does Dr. Dinello's supervisory status

alone establish his personal involvement. *See Whitley v. Ort*, No. 17-CV-3652, 2018 WL

4684144, at *7 (S.D.N.Y. Sept. 28, 2018) ("Even if [the defendant doctor] was responsible for

supervising medical care at Green Haven, supervisory status, without more, is not sufficient to subject a defendant to § 1983 liability." (citation, quotation marks, and original alterations omitted)).  Therefore, Plaintiffs fail to plausibly allege the personal involvement of Dr. Dinello in any constitutional violation.

### 3.  Analysis — First and Third Causes of Action

In their first and third causes of action, Plaintiffs allege that Defendants adopted and now enforce a catheter distribution policy that does not comply with the current medical standard of care and, further, ignores the manufacturer's labeling on the catheters, specialists' recommendations, and Plaintiffs' individual needs.  (SAC ¶¶ 71, 244, 258.)  Defendants argue that Plaintiffs cannot state an Eighth Amendment claim based on the alleged policy because the current standard of care — as evidenced by guidelines published by, among other organizations, the National Institutes of Health ("NIH") — provides, contrary to Plaintiffs' allegations, that "acceptable medical practice for intermittent catheterization requires merely that the catheter be cleaned with soap and arm water, air dried, and stored in a clean towel or bag between uses," that "[t]here is no need to sterilize the catheter before re-use," and, most importantly, that "it is acceptable medical practice for a patient to use a single catheter for up to two to four weeks, or until the catheter becomes brittle."  (Defs.' Mem. 15; *see also id.* at 8–10 (further describing Defendants' conception of the current standard of care).)  Defendants also argue that the Food and Drug Administration ("FDA") guidelines for the labeling medical devices provide that a manufacturer's "'single-use' designation" on catheter labels "includes devices intended for use on a single patient during a single procedure."  (*Id.* at 16 (some quotation marks omitted).)  The upshot, Defendants argue, is that the challenged catheter policy comports with the current standard of care and the device labeling, and, accordingly, that Plaintiffs cannot state an Eighth

Amendment claim.  (*Id.* at 15–18.)

Although Plaintiffs engage directly with Defendants' conception of the standard-of-care and of device labeling arguments, (Pls.' Mem. 11–16), and Defendants offer a reply, (Defs.' Reply 1–9), this line of argument is inappropriate at the motion-to-dismiss stage.  As noted, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted). Defendants argue that the Court "can and should take judicial notice" of government-published guidelines because they are public records "retrieved from [an] official government website[]." (Defs.' Mem. 16 (quoting *Fernandez v. Zoni Lang. Ctrs., Inc.*, No. 15-CV-6066, 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016)).)  It is true that the Court may take judicial notice of public records at the motion-to-dismiss-stage.  *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998); *Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 321 (S.D.N.Y. 2015).  However, in so doing, the Court may do so *only* "to determine *what* statements they contained . . . [and] *not* for the truth of the matters asserted." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citation and original alterations omitted) (emphases added).  Accordingly, the Court may not consider Defendants' proffered NIH and FDA guidelines (or any other cited public records) as in fact establishing or clarifying a particular standard of care.  Should this case proceed to summary judgment, the Court may then consider these public records, along with other evidence submitted by the Parties, for the truth of the matters asserted.  *See Parks v. Blanchette*, 144 F. Supp. 3d 282, 317 (D. Conn. 2015) (considering, in motion for summary judgment on Eighth Amendment claim, government-published treatment guidelines in

determining whether the defendant "substantially deviated from the standard of care"); *see also West v. Goord*, No. 05-CV-447, 2017 WL 3251253, at *14 (W.D.N.Y. July 31, 2017) (granting summary judgment on Eighth Amendment claim where the plaintiff "fail[ed] to identify any evidence in the record indicating that the failure to provide a specific number of catheters was medically insufficient, or that it represented a deliberate indifference to any serious medical risk," failed to "indicate how many catheters per week were required for his condition," and failed to "refute [the defendant's] assertion that [his] treatment was consistent with the prevailing standards of medical care"); *Horton v. Winnebago County Sheriff's Dep't*, No. 14-CV-50194, 2017 WL 4280981, at *10 (N.D. Ill. Sept. 27, 2017) (denying summary judgment on Eighth Amendment claim where, although a "close question," there was sufficient evidence such that "a reasonable jury could find that the reuse policy was 'blatantly inappropriate' [as had been argued by the plaintiff's expert] as applied to [the] plaintiff and his situation") *Jefferson v. Overton*, No. 13-CV-220, 2017 WL 3922909, at *6 (W.D. Pa. Sept. 7, 2017) (denying summary judgment on Eighth Amendment claim where there was "sufficient" evidence that the defendants "knowingly disregarded the fact that [the plaintiff] was suffering chronic infections as a result of reusing 'single use' catheters" and denied the plaintiff's "reasonable requests for infection control measures such as sterile gloves, antiseptic wipes, and a sufficient number of catheters to comply with 'single use' labeling"); *cf. Cooper*, 2019 WL 113727, at *3 (declining to dismiss Eighth Amendment claim where, having considered only allegations made in the complaint, the plaintiff alleged the defendants "directed him to reuse single-use catheters and . . . refused to provide him with an adequate supply of sterile catheters," thereby causing him to "suffer[] from infections").

Defendants make no other argument on the merits of Plaintiffs' first and third causes of action. Accordingly, the Court declines to dismiss Plaintiffs first and third causes of action for

failure to state a claim.

### 4.  Analysis — Second Cause of Action

In their second cause of action, Plaintiffs allege that Dr. Lee (along with the John Doe FHSDs and the RMD Defendants dismissed above for failure to allege personal involvement) has delayed treating Plaintiffs' complaints of UTIs and related catheterization injuries for "days if not weeks," in violation of Plaintiffs' Eighth Amendment rights.  (SAC ¶ 253.)  Defendants do not appear to contest that these allegations satisfy the objective element required to state an Eighth Amendment claim.  Rather, Defendants argue that Plaintiffs' allegations fail to satisfy the mental element, in that they are insufficiently specific to suggest that Dr. Lee exhibited deliberate indifference to Plaintiffs' medical needs.  (Defs.' Mem. 20.)

"[A] delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces a conscious disregard of a substantial risk of serious harm."  *Pabon v. Wright*, No. 99-CV-2196, 2004 WL 628784, at *8 (S.D.N.Y. Mar. 29, 2004) (citation and quotation marks omitted), *aff'd*, 459 F.3d 241 (2d Cir. 2006).  That is, "denying or delaying needed treatment for a serious medical condition constitutes deliberate indifference for Eighth Amendment purposes only if," for example, the "official[] delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for several days, or delayed major surgery."  *Myrie v. Calvo*, 615 F. Supp. 2d 246, 248 (S.D.N.Y. 2009) (citation omitted); *see also Estelle*, 429 U.S. at 104 (noting that, to be liable on a delay theory, prison officials must "intentionally deny[] or delay[] access to medical care").

As an initial matter, Plaintiffs do not allege that Knight suffered any delay at all in his medical treatment.  (SAC ¶¶ 135–40.)  As to Stewart, Plaintiffs allege a single instance of delay, namely, that "[w]hen Mr. Stewart recently complained of symptoms of a UTI, medical personnel

did not run a test until thirty (30) days after his initial complaint," thereby causing him to suffer "unbearable" pain that "interfered with [his] daily activities" and to "[do] his best to treat his symptoms with prison homeopathic remedies while waiting to get tested." (*Id.* ¶¶ 162–64, 169.) Yet, Plaintiffs fail to state when this alleged incident occurred, to whom Stewart complained, or who later conducted Stewart's medical testing. Plaintiffs thus fail to connect Dr. Lee (or any other Defendant) to the alleged unconstitutional delay, and therefore fail to plausibly show that Dr. Lee (or any other Defendant) "consciously disregarded a substantial risk of serious harm" to Stewart. *Pabon*, 2004 WL 628784, at *8.

Finally, as to Dickinson, Plaintiffs allege two instances of delay. First, Plaintiffs allege that Dickinson was "admitted to the Shawangunk infirmary with extreme abdominal pain and a mildly distended bladder" on or about June 27, 2017, but was not tested for a UTI until July 7, 2017, and that those "results were not reviewed by Dr. Lee until July 13, 2017, despite the nurse noting that Mr. Dickinson's symptoms were similar to the UTI he suffered in February 2017." (SAC ¶¶ 182–83.) Yet, as Defendants argue, these allegations are "vague and non-specific." (Defs.' Mem. 22.) Although Plaintiffs do allege a delay in testing and in reviewing test results, they critically do not connect Dr. Lee to the testing delay. And as to the reviewing delay, Plaintiffs fail to allege important facts, such as when the (unidentified) nurse made her notation of Dickinson's UTI-like symptoms or whether the nurse informed *Dr. Lee* of Dickinson's symptoms. Further, Plaintiffs fail to allege what the test results ultimately showed or, indeed, what resulting *medical treatment* — if any — was delayed. There are thus insufficient facts to plausibly suggest that Dr. Lee "consciously disregarded a substantial risk of serious harm" to Dickinson in connection with the alleged July 2017 UTI. *Pabon*, 2004 WL 628784, at *8.

Second, Plaintiffs allege that "[i]n October 2017[,] Mr. Dickinson alerted medical

personnel and Dr. Lee that he was suffering from UTI symptoms yet again," that he was tested

for a UTI on October 24, 2017, that "[o]n November 2, 2017[,] [he] complained to Dr. Lee . . .

that he had not received the results for the test and had not yet been treated," and that "[t]he

results of the UTI test were not reviewed until November 20, 2017."  (SAC ¶¶ 184–87.)  Here,

Plaintiffs do not allege facts suggesting a delay in testing.  Rather, Plaintiffs allege a delay in

receiving test results and in medical treatment.  Yet, Plaintiffs allege no facts suggesting that Dr.

Lee "acted *intentionally* to delay the provision of medical treatment in a way that subjected

[Dickinson] to an excessive risk of harm."  *Stewart v. City of New York*, No. 15-CV-4335, 2018

WL 1633819, at *8 (S.D.N.Y. Mar. 31, 2018) (emphasis added).  Nor do Plaintiffs plausibly

allege that Dr. Lee "*recklessly failed to act* with reasonable care to mitigate any excessive risk

posed by a subsequent delay in provision of medical treatment" — for example, by alleging facts

suggesting going toward Dickinson's UTI symptoms and pain.  *Id.* (emphasis added).  Finally,

there are no allegations that Dickinson's "condition worsened as a result of [the] delay," *Carno*,

2019 WL 2287966, at *12, or that the delay *itself* "created an unreasonable risk to [Dickinson's]

future health," *Darby v. N.Y.C. Health & Hosps. Corp.*, No. 18-CV-2869, 2019 WL 1994490, at

*5 (E.D.N.Y. May 6, 2019).  Absent further factual specificity, the allegations suggest only that

Dr. Lee acted, or failed to act, with "negligence amounting to medical malpractice," which is

"insufficient to state a claim of deliberate indifference."  *Whitley v. Ort*, No. 17-CV-3652, 2018

WL 4684144, at *8 (S.D.N.Y. Sept. 28, 2018.  Therefore, as with the July 2017 UTI, there are

insufficient facts to plausibly suggest that Dr. Lee "consciously disregarded a substantial risk of

serious harm" to Dickinson in connection with the alleged October 2017 UTI.  *Pabon*, 2004 WL

628784, at *8; *see also Bell v. Jendell*, 980 F. Supp. 2d 555, 562 (S.D.N.Y. 2013) (collecting

cases for the proposition that courts dismiss deliberate indifference claims in which inmates

"merely allege a delay in the provision of medication or treatment, but fail to allege that the delay was either intentional or reckless"); *Myrie*, 615 F. Supp. 2d at 248 (dismissing deliberate indifference claim based on delayed treatment where "[n]o facts [were] pleaded tending to show that [the] defendant . . . took affirmative steps to ensure that [the plaintiff] would not receive his [medical] treatment").

Accordingly, the Court concludes that Plaintiffs fail to state an Eighth Amendment claim based on delayed medical treatment.

### 5.  Analysis — Claims Seeking Injunctive Relief & Cross-Motion To Amend

The Second Amended Complaint requests, in addition to compensatory damages, that the Court "[p]ermanently enjoin[] Defendants . . . and all persons acting in concert with them from subjecting from subjecting Plaintiffs . . . to the illegal policies, practices, omissions[,] and conditions described," and that the Court "[d]irect[] Defendants to conduct individualized assessments of Plaintiffs . . . to determine the number of sterile, single-use catheters and supplies required per day to best ensure [their] health and freedom from preventable infections, injury[,] and illnesses resulting from the use of unsterilized catheters."  (SAC ¶¶ 267–68.)

As Defendants argue, (Defs.' Mem. 25), these claims for injunctive relief must be dismissed because Plaintiffs have sued Defendants only in their individual capacities, (SAC ¶¶ 29–36).  "Plaintiffs cannot obtain prospective injunctive relief from . . . [d]efendants sued in their individual capacities as such [d]efendants would not have the authority to provide such relief in their individual capacities."  *Kuck v. Danaher*, 822 F. Supp. 2d 109, 143 (D. Conn. 2011); *see also Silva v. Farrish*, No. 18-CV-3648, 2019 WL 117602, at *12 n.16 (E.D.N.Y. Jan. 7, 2019) ("[T]o the extent that [the plaintiffs] assert claims for injunctive and declaratory relief as against [the defendants] in their individual capacities, the Court recommends that those claims be

dismissed as improper." (citations omitted)). That is because "[a] victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him." *Kentucky v. Graham*, 473 U.S. 159, 167–68 (1985); *see also Tanvir v. Tanzin*, 894 F.3d 449, 459 (2d Cir. 2018) (noting that "[i]n an official capacity suit, the real party in interest is the governmental entity and not the named official," while "individual capacity suits seek to impose individual liability upon a government officer for her actions under color of law" (citations, quotation marks, and alterations omitted)).

Plaintiffs do not contest that injunctive relief is unavailable where defendant-officials are sued only in their individual capacities. Instead, Plaintiffs request, in their Cross-Motion To Amend, leave to amend the Second Amended Complaint to add claims against Defendants in their official capacities. (Pls.' Mem. 1, 22–24.)[5] The Court grants this request.

Leave to amend pleadings shall be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a). However, "[i]t is within the sound discretion of the district court to grant or deny leave to amend." *Barbata v. Latamie*, No. 11-CV-7381, 2012 WL 1986981, at *2 (S.D.N.Y. June 4, 2012) (quoting *Green v. Mattingly*, 585 F.3d 97, 104 (2d Cir. 2009)). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). However, "[o]utright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) (citing *Foman*, 371 U.S. at 182).

Here, Plaintiffs argue that their failure to bring official-capacity claims was a "clerical

---

[5] Plaintiffs also seek to add John Morley, the current acting CMO of DOCCS, as a Defendant. (*See* Pls.' Mem. 1, 24.)

error." (Pls.' Opp'n 24.) This characterization is somewhat implausible. This is not a case of a stray omission: Whereas the First Amended Complaint repeatedly stated that Defendants were sued in both their individual and official capacities, (FAC ¶¶ 34–40, 224), the Second Amended Complaint repeatedly states that Defendants are sued only in their individual capacities, (SAC ¶¶ 29–36; *id.* at 31–33)). Moreover, the Second Amended Complaint states (rather unusually) that Plaintiffs' counsel received the "time, expertise[,] and experience of" several attorneys at two other law firms. (*Id.* at 35.) Plaintiffs fail to offer a compelling explanation for their negligence (and, apparently, that of outside counsel). Further, as Defendants point out, when the Court granted Plaintiffs permission to file the instant Second Amended Complaint, it stated — with Plaintiffs' acknowledgement — that the Second Amended Complaint would be subject to dismissal with prejudice. (*See* Defs.' Opp'n 5; Dkt. (entry for Dec. 17, 2018); Letter from Amy Jane Agnew, Esq. to Court (Dkt. No. 70).) Plaintiffs now fail to meaningfully explain why the Court should permit another amended filing.

Notwithstanding Plaintiffs' rather incomplete explanations for their negligence, the Court grants, in light of Rule 15(a)(2)'s "permissive standard" and the Second Circuit's "strong preference for resolving disputes on the merits," *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (citation and quotation marks omitted), Plaintiffs' request for leave to amend. The Court has not found evidence of "undue delay, bad faith[,] or dilatory motive." *Eberle v. Town of Southampton*, 985 F. Supp. 2d 344, 346 (E.D.N.Y. 2013); *see also Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 98 (S.D.N.Y. 2010) (granting leave to amend over two years after initiation of the case even where the plaintiff offered "vague or 'thin' reasons" for delay (citation omitted)). Nor would allowing Plaintiffs to amend cause Defendants "undue prejudice," *Eberle*, 985 F. Supp. 2d at 346, for, as Plaintiffs point out, (Pls.' Mem. 23–24), the

Parties have not yet begun discovery. *See Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) ("Undue prejudice arises when an amendment comes on the eve of trial and would result in new problems of proof." (citation, quotation marks, and alteration omitted)); *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (affirming denial of leave to amend sought after discovery had closed and while summary judgment motion was pending). Finally, Defendants have not shown that allowing Plaintiffs to amend would be "futile." *Eberle*, 985 F. Supp. 2d at 346. "To determine whether a proposed pleading is futile, courts analyze whether it would withstand a motion to dismiss." *Agerbrink v. Model Service LLC*, 155 F. Supp. 3d 448, 456 (S.D.N.Y. 2016) (citation omitted). As described *supra* Sections II.B.2–.4, Plaintiffs' claims have survived, at least in part, Defendants' Motion To Dismiss.

Accordingly, the Court dismisses Plaintiffs' request for injunctive relief, but grants Plaintiffs' Cross-Motion To Amend.[6]

### 6. Qualified Immunity

Finally, Defendants argue that they are entitled to qualified immunity. (Defs.' Mem. 22–24.) "Qualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (citation and quotation marks omitted). In determining whether a right is clearly established, the "inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (citation and quotation marks omitted). "In the Second

---

[6] In light of the Court's conclusion that Plaintiffs be permitted a final opportunity to amend, the Court need not consider Plaintiffs' Motion for Pre-Certification Discovery at this time. Accordingly, the Court denies the Motion without prejudice to renew.

Circuit, 'a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.'" *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 702 (S.D.N.Y. 2011) (quoting *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004)).

Qualified immunity is an affirmative defense, *Lore v. City of Syracuse*, 670 F.3d 127, 149 (2d Cir. 2012), one that "[t]ypically . . . will rest on an evidentiary showing of what the defendant did and why," *Amaker v. Lee*, No. 13-CV-5292, 2019 WL 1978612, at *17 (S.D.N.Y. May 3, 2019) (quotation marks omitted) (ultimately citing *Curry v. City of Syracuse*, 316 F.3d 324, 334 (2d Cir. 2003)); *see also Pusepa v. Annucci*, No. 17-CV-7954, 2019 WL 690678, at *17 (S.D.N.Y. Feb. 19, 2019) (noting that qualified immunity is "typically addressed at the summary judgment stage, because it usually depends on the facts of the case, making dismissal at the pleading stage inappropriate" (citations, quotation marks, and alterations omitted)); *James v. Suffolk County Corr. Facility*, No. 13-CV-2344, 2014 WL 4659300, at *5 (E.D.N.Y. Sept. 17, 2014) (noting that evidence as to qualified immunity is "normally adduced during the discovery process and at trial"). Where the qualified immunity defense is raised "at the motion to dismiss stage, defendants must accept a more stringent standard." *Amaker*, 2019 WL 1978612, at *17 (quotation marks and alterations omitted) (citing *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)); *see also Neary v. Wu*, No. 17-CV-2876, 2019 WL 668584, at *2 (2d Cir. Feb. 19, 2019) ("Defendants advancing a qualified-immunity defense at the motion to dismiss stage face a formidable hurdle." (citation, quotation marks, and alterations omitted)); *Garcia v. Does*, 779 F.3d 84, 96–97 (2d Cir. 2015) ("It is certainly true that motions to dismiss a plaintiff's complaint under Rule 12(b)(6) on the basis of an affirmative defense will generally face a difficult road.").

"Not only must the facts supporting the defense appear on the face of the complaint, but . . . the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna*, 386 F.3d at 436 (citations, quotation marks, and alterations omitted)).

Here, as to Plaintiffs' first and third causes of action regarding the alleged catheter policy, Defendants argue that they are entitled to qualified immunity because "inmates have no clearly established right to receive a certain number of catheters per day" and, further, because "a reasonable prison doctor could have believed that providing . . . one catheter per day and sufficient supplies to clean the catheter between uses with soap and water in accordance with current guidelines from the NIH" did not violate any clearly established right. (Defs.' Mem. 24–25.) These arguments, however, effectively track Defendants' merits argument that they complied with the current medical standard of care, which the Court rejected as inappropriate at the motion-to-dismiss stage. *See supra* Section II.B.3. Therefore, the Court concludes that "[f]actual issues remain regarding" Plaintiffs' first and third causes of action, and, accordingly, "the Court does not decide whether Defendants are entitled to qualified immunity for those claims at this time." *Barnes v. Harling*, 368 F. Supp. 3d 573, 606 (W.D.N.Y. Mar. 19, 2019) (citing, inter alia, *In re State Police Litig.*, 88 F.3d 111, 127 (2d Cir. 1996) ("The availability of qualified immunity depends on the resolution of these fact issues.")); *see also Neary*, 753 F. App'x at 84–85 ("Taking [the plaintiff's] allegations [of deliberate indifference] as true and drawing all permissible inferences in [the plaintiff's] favor and against [the defendants'] qualified-immunity defense, there is no doubt that [the defendants] are not entitled to qualified immunity at this juncture."); *Osorio-Pizarro v. Burdo*, No. 16-CV-156, 2019 WL 1010420, at *6 (N.D.N.Y. Mar. 4, 2019) (denying summary judgment at motion-to-dismiss stage where "[a]t

this stage of litigation . . . the existence of disputed facts prevents its application"); *Pusepa*, 2019 WL 720699, at *17 (declining to grant qualified immunity at the motion-to-dismiss stage where "[w]hether [the] [D]efendants in fact acted in conformity with their constitutional obligations cannot be decided on the basis of the pleadings"). Defendants may re-raise their qualified immunity defense at a later stage. *See Verley v. Wright*, No. 02-CV-1182, 2007 WL 2822199, at *14 (S.D.N.Y. Sept. 27, 2007) (considering, in context of a qualified immunity argument in motion for summary judgment, expert's evidence as to the relevant medical standard of care); *see also Neary*, 753 F. App'x at 84–85 (affirming district court's statement that the defendants "may raise the immunity defense after discovery").[7]

## III.  Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part. Defendants Dr. Mueller, Dr. Dinello, Dr. Bozer, and Dr. Hammer are dismissed, as is Plaintiffs' second cause of action and requests for injunctive relief.

Plaintiffs' Cross-Motion To Amend is granted. Plaintiffs are granted one final opportunity to amend. The Court will not grant another opportunity. Plaintiffs shall file a third amended complaint within 30 days of the date of this Opinion. No extensions will be granted. Plaintiffs should include within that third amended complaint all changes to correct the deficiencies identified in this Opinion that Plaintiffs wish the Court to consider. Plaintiffs are advised that the third amended complaint will replace, not supplement, all prior complaints and filings. The third amended complaint must contain all of the claims, defendants, and factual allegations that Plaintiffs wish the Court to consider. If Plaintiffs fail to abide by the 30-day

---

[7] Because the Court dismisses Plaintiffs' second cause of action regarding delayed medical care for failure to state a claim, *see supra* Section II.B.4, it need not consider whether Defendants are entitled to qualified immunity as to this cause of action at this time.

deadline, the dismissed claims and defendants will be dismissed with prejudice.

Plaintiffs' Motion for Pre-Certification Discovery is denied without prejudice to renew
following filing of the third amended complaint.

The Clerk of the Court is respectfully requested to terminate the pending Motions. (Dkt.
Nos. 83, 86, 92).

SO ORDERED.

DATED:     June ᗥ5 , 2019
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE