UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HUGH KNIGHT, WAYNE STEWART, and
SHANNON DICKINSON, *on behalf of
themselves and all others similarly situated*.,

                              Plaintiffs,

        -v-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS, *et al*.,

                              Defendants.

Case No. 18-CV-7172 (KMK)

OPINION & ORDER

Appearances:

Amy Jane Agnew, Esq.
Law Office of Amy Jane Agnew, P.C.
New York, NY
*Counsel for Plaintiffs*

Andrew Stuart Amer, Esq.
New York State Department of Law
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Hugh Knight ("Knight"), Wayne Stewart ("Stewart"), and Shannon Dickinson

("Dickinson") (collectively, "Plaintiffs") are inmates in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS") who require intermittent

catheterization.  (Third Am. Compl. ("TAC") ¶¶ 5–10, 13–17, 20–24 (Dkt. No. 108).)  Plaintiffs

bring this Action, pursuant to 42 U.S.C. § 1983, on behalf of themselves and all others similarly

situated, against DOCCS and several DOCCS medical officials: current Chief Medical Officer

("CMO") John Morley ("Morley"); former Chief Medical Officer Carl Koenigsmann

("Koenigsmann"); Shawangunk Correctional Facility ("Shawangunk") Health Services Director ("FHSD") Chung Lee ("Lee"); Nurse Practitioner ("NP") Albert Acrish ("Acrish"); and numerous John and Jane Doe medical professionals and administrators.  (*Id.* ¶¶ 25–38.)

Before the Court is Defendants' Motion To Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").  (Not. of Mot. (Dkt. No. 155).)  For the reasons that follow, the Motion is granted in part and denied in part.

### I.  Background

#### A. Factual Background

Plaintiff's factual allegations have been detailed at length in a prior Opinion of this Court. (*See* 2019 Opinion (Dkt. No. 104).)  For the purpose of the instant Motion, however, the relevant allegations, drawn from the Third Amended Complaint ("TAC"), are as follows:

##### 1.  General Allegations

Knight, Stewart, and Dickinson are DOCCS inmates, all paraplegics and largely wheelchair-bound, who do not have control over their bladder function and thus require "intermittent catherization," that is, "the insertion and removal of a catheter several times a day to empty the bladder."  (TAC 1 (preliminary statement); *see also id.* ¶¶ 5–24.)  Plaintiffs require a "steady supply" of catheters — "at least 4 to 6 catheters per day" — and "must also be able to clean [their] hands and body parts in order to avoid bacterial transfer that can develop into" urinary tract infections ("UTIs").  (*Id.* ¶¶ 11–12, 18–19, 23–24.)

Until recently, Plaintiffs did not receive an "adequate number of single-use catheters per day nor adequate supplies to effectively clean their genital area and hands before insertion."  (*Id.* ¶ 80.)  As a result of this failure, Plaintiffs developed repeated infections and suffered severe pain, and in one case, permanent kidney damage.  (*Id.* ¶¶ 140, 199–209, 219, 233, 257–69.)

Plaintiffs concede, however, that as of July 2019, "Defendants have started providing the three representative plaintiffs with an appropriate number of daily sterile, single-use catheters." (*Id.* ¶ 80 n.1; *see also id.* ¶¶ 175, 221, 286.)

Plaintiffs also make specific allegations with respect to the treatment and provision of catheters for each of the three named Plaintiffs.

### 2. Knight

Upon Knight's transfer to Shawangunk in or around 2014, Lee prescribed Knight only one sterile single-use catheter and two packets of lubricant per day. (*Id.* ¶ 133.) As a result, Knight has suffered from several "very severe" UTIs since 2014, resulting in permanent kidney damages and chronic infections. (*Id.* ¶ 140.) Despite knowing about these UTIs, Lee refused to increase the number of catheters provided to Knight until after Plaintiffs filed their First Amended Complaint. (*Id.* ¶ 142.)

On December 14, 2016, Lee diagnosed and treated Knight for a UTI. (*Id.* ¶ 143.) On January 3, 2017, Knight complained to a nurse that his urine was "foul-smelling." (*Id.* ¶ 144.) When Lee reviewed the nurse's note, he ordered that a urinalysis be conducted on January 5, 2017; however, the urinalysis was not conducted for over a week. (*Id.* ¶¶ 144–45.) On January 12, 2017, Lee reviewed the results and prescribed Knight antibiotics. (*Id.* ¶ 146.) During these two months, Knight repeatedly requested additional sterile, single use catheters, but in response, Lee simply ordered "more soap." (*Id.* ¶ 147.)

From April 2017 through May 2018, Lee diagnosed and treated Knight for several additional UTIs and even referred to him as an "offender with freq[uent] UTI[s]." (*Id.* ¶¶ 148–53.) However, despite knowing of the recurrent UTIs, Lee did not order a larger supply of catheters for Knight. (*Id.* ¶ 151.) In both May and July 2018, Plaintiff was admitted to the

3

emergency room at Albany Medical Center for at least six days due to UTIs.  (*Id.* ¶¶ 153–59.)
After the conclusion of the second such admission, the urologist examining Knight advised him
"that he must receive 6 new, sterile catheters per day—not reused ones" and provided him with
discharge papers emphasizing that he was not to reuse catheters.  (*Id.* ¶¶ 159–62.)  Even then,
however, Lee ordered that Knight be provided only with 4 catheters per day "despite knowing
that Mr. Knight was to catheterize himself six [] times a day and was not to re-use catheters."
(*Id.* ¶ 162.)  Moreover, after only three days, Lee again reduced Knight's supply of catheters to
one per day.  (*Id.* ¶¶ 164–65.)  On or about October 29, 2018, Knight "begged" Lee for the six
catheters per day prescribed by a urology specialist, but while Lee suggested that he would
prescribe accordingly, he never changed the prescription.  (*Id.* ¶ 169.)  In fact, Lee did not
instruct staff to provide Knight with six catheters per day until December 14, 2018.  (*Id.* ¶ 171)

### 3.  Stewart

When Stewart was transferred to Shawangunk, his daily supply of catheters was cut to
only three per day with only three packages of lubricant.  (*Id.* ¶ 186.)  Stewart "immediately
complained" to Lee and other medical officials that three catheters was insufficient and that he
believed he would "catch" UTIs.  (*Id.* ¶ 188.)  Nevertheless, from mid-May 2017 to mid-April
2019, Stewart received only three sterile, single-use catheters per day.  (*Id.* ¶ 189.)  Stewart
attempted to clean these catheters with soap and water, sought to trade with other inmates to
obtain additional catheters, filed grievances, and discussed the issue with Lee.  (*Id.* ¶¶ 190–94.)
However, on February 9, 2018, Lee reduced Stewart's daily supply of catheters from three to
two.  (*Id.* ¶ 198.)  On February 13, 2018, Stewart informed a nurse that he was suffering from a
UTI; Stewart underwent a urine test the same day.  (*Id.* ¶ 199.)  Two weeks later, Stewart
reminded Lee that he was suffering from a UTI and had not yet been treated.  (*Id.* ¶ 200.)  On

March 14, 2017, Lee finally reviewed the February 13, 2018 urinalysis, and he prescribed antibiotics the next day.  (*Id.* ¶¶ 201–02.)

In April 2018, December 2018, and March 2019, Stewart was again treated for UTIs.  (*Id.* ¶¶ 203–10.)  Nevertheless, Lee informed Steward that he was lucky to receive three catheters per day because "Albany only allows one."  (*Id.* ¶ 212.)  On April 15, 2019, Stewart again complained of UTI symptoms to a nurse who was "appalled by the one sterile, single-use catheter per day policy," and encouraged Steward to write a letter to a senior nurse administrator.  (*Id.* ¶ 215.)  Before the letter was sent, however, the same nurse spoke with Lee, and Stewart began receiving five catheters per day.  (*Id.* ¶ 216.)  Stewart currently receives an adequate supply of catheters at Shawangunk, but believes that this could easily change as a result of a transfer or a change in personnel.  (*Id.* ¶ 221.)

### 4.  Dickinson

When first entering DOCCS custody in 2016, Dickinson was given a box of single use catheters which was replenished as needed.  (*Id.* ¶ 224.)  However, upon his transfer to Shawangunk, Lee prescribed Dickinson only three single-use catheters per day.  (*Id.* ¶ 226.)  In doing so, Lee did not examine Mr. Dickinson to ascertain the proper number of catheters, nor did he send him to a urologist to assess his individual medical needs.  (*Id.* ¶ 227.)  Like Stewart, Dickinson "repeatedly grieved and complained about the inadequate supply of sterile, single-use catheters and supplies" to Lee and various nurses.  (*Id.* ¶ 230.)

On February 26, 2017, Dickinson suffered a UTI, and on March 2, 2017, Lee reviewed the positive UTI test.  (*Id.* ¶¶ 233–34.)  On June 27, 2017, "Dickinson was admitted to the Shawangunk infirmary with extreme abdominal pain and a mildly distended bladder, symptoms of a UTI," but he was not tested for a UTI until July 7, 2017.  (*Id.* ¶ 235–36.)  Moreover, Lee did

not review the test results until July 13, 2017, despite a nurse noting that Dickinson's symptoms were similar to those of his earlier UTI.  (*Id.* ¶ 236.)  The test results were positive and Dickinson was finally treated; however, when Lee discharged Dickinson from the infirmary, he again ordered that Dickinson receive only three catheters per day.  (*Id.* ¶ 237–38.)

On January 5, 2018, Dickinson again complained of UTI symptoms, and on January 22, 2018, Lee again admitted Dickinson to the Shawangunk infirmary.  (*Id.* ¶ 239–41.)  The next day, Dickinson was "rushed to the Albany Medical Center," where he was treated for seven days for "penile cellulitis, an acute urological condition caused by infection."  (*Id.* ¶ 242–43.) "Dickinson's treating urologist, Dr. Ronald Kaufman, recommended that he cease re-washing single-use catheters and use a sterile catheter each and every time he self catheterizes," and this recommendation was conveyed to Lee.  (*Id.* ¶ 244–45.)  Nevertheless, just ten days later, Lee decreased Dickinson's catheters per day from three to two.  (*Id.* ¶ 247.)  Dickinson grieved the decrease and complained directly to medical staff, including Lee.  (*Id.* ¶ 249.)

On May 23, 2018, Dickinson was transferred to Green Haven Correctional Facility ("Green Haven").  (*Id.* ¶ 250.)  At Green Haven, Acrish prescribed Dickinson only two sterile catheters per day, two three-gram packages of lubricant, and fourteen pairs of gloves.  (*Id.* ¶ 251.)  In doing so, Acrish neither assessed Dickinson himself nor sent him to a specialist.  (*Id.* ¶ 252.)  Moreover, despite Acrish's prescription of two catheters per day, Dickinson in fact received only one per day.  (*Id.* ¶ 254.)  Dickinson grieved the inadequate number of catheters, but when he complained directly to Acrish, he was told that one catheter per day "is the policy." (*Id.* ¶¶ 255–56.)  On July 13, 2018, Dickinson complained to medical staff that catheterization was becoming painful, and on July 18, 2018, Acrish referred Dickinson to urology; however, Acrish did not initially order a urinalysis to test for a UTI.  (*Id.* ¶¶ 257–58.)  On July 26, 2018,

Dickinson complained about increasing pain and inquired about the urology appointment. (*Id.* ¶ 259.) On August 10, 2018, Dickinson finally saw Dr. Marc Janis ("Janis"), a urologist, regarding bloody urethral discharge and pelvic pain. (*Id.* ¶ 261.) When Dickinson informed Janis that he had to wash and reuse his catheters, Janis responded that the practice was "preposterous." (*Id.* ¶ 262.) Dickinson then complained again about the catheter policy to medical personnel at Green Haven. (*Id.* ¶ 263.)

On August 9, 2018, Acrish finally tested Dickinson for a UTI, but he did not review the test results until August 22, 2018. (*Id.* ¶ 260.) Between August 15, 2018 and October 18, 2018, Dickinson complained of substantial pain caused by a UTI on at least six separate occasions, but Acrish "continued to ignore Mr. Dickinson, only noting that he was 'scheduled for a cystoscopy.'" (*Id.* ¶¶ 264–70.) On October 31, 2018, Dr. Janis performed the cystoscopy at Montefiore Medical Center, revealing that Dickinson was suffering from urethral stricture, likely caused by infection and injury from "traumatic catheterizations," and again recommended that Dickinson use between five and seven catheters per day. (*Id.* ¶ 271–73.). Nevertheless, on December 5, 2018, Acrish again prescribed Dickinson only 14 catheters per week and seven packets of lubricant. (*Id.* ¶ 276.)

On January 7, 2019, Dickinson again complained about "cloudy urine, odor and pain." (*Id.* ¶ 278.) Then, without examining Dickinson, Acrish ordered that Dickinson receive only one catheter per day for three months. (*Id.* ¶ 279.) On March 14, 2019, Dickinson again reported, and tested positive for, a UTI, but Acrish did not increase Mr. Dickinson's supply of catheters. (*Id.* ¶ 280.) On March 21, 2019, DOCCS transferred Dickinson to Five Points Correctional Facility, and to the care of Nurse Practitioner Kristin Salotti ("Salotti"). (*Id.* ¶ 282.) Salotti immediately prescribed Dickinson 28 catheters per week. (*Id.* ¶ 283.) Dickinson continues to

7

receive an adequate supply of catheters and related materials at Five Points.  (*Id.* ¶ 286.)

### 5.  Causes of Action

Plaintiffs bring two Eighth Amendment claims pursuant to 42 U.S.C. §1983.  The first cause of action alleges that Defendants exhibited deliberate indifference to Plaintiffs' health by "adopt[ing] and implement[ing] a policy which restricts the number of sterile, single-use catheters to the bare minimum and demands patients rewash catheters," and by "allow[ing] the deprivation of an adequate number of sterile catheters despite knowing that patients suffer from UTIs and hospitalizations as a result of infections from unsterile catheterizations."  (*Id.* ¶¶ 317–18.)  The second cause of action, which is not readily distinguishable from the first, alleges that Defendants denied Plaintiffs adequate medical care by "fail[ing] to provide five to seven sterile, single-use catheters."  (*Id.* ¶ 324.)[1]  Both claims are brought against DOCCS, Morley (in his official capacity), Koenigsmann (in his individual capacity), Lee (in his individual capacity), Acrish (in his individual capacity), and various John and Jane Doe DOCCS medical officials (in their individual capacities).  (*Id.* ¶¶ 311–12, 321–22.)[2]

---

[1] Plaintiffs bring suit on behalf of themselves and a putative class of "all present and future prisoners and detainees with bladder function disabilities who are or will be housed in New York State Correctional Facilities and require intermittent self-catheterization to empty their bladders."  (TAC ¶ 288.)

[2] The TAC appears to contradict itself in several places regarding whether certain Defendants are sued in their official or individual capacities.  For example, when introducing the Defendants, the TAC states that "Defendant Morley is sued in his official capacity for injunctive and declaratory relief purposes and in his individual capacity for failing to correct DOCCS' catheter policy, despite knowing of the pain and suffering of the plaintiff class members since the filing of this lawsuit."  (TAC ¶ 29.)  However, when introducing the two "claims for relief," the TAC states that Morley is sued only "in his official capacity."  (*Id.* ¶¶ 311–12, 321–22.)  As Plaintiffs' briefing confirms the latter assertion, (*See* Mem. of Law in Opp. to Mot. ("Pls.' Mem.") 23 (Dkt. No. 157)), the Court assumes that section of the TAC controls.  Moreover, the Court notes that the TAC contains no factual allegations regarding Morley's own conduct.  Accordingly, even were the Court to consider claims against him in his individual capacity, such claims would be dismissed.  *See Green v. Garcia*, No. 18-CV-1745, 2020 WL 1467359, at *4–5

B.  Procedural History

The initial Complaint was filed on August 10, 2018.  (Compl. (Dkt. No. 9).)  The First

Amended Complaint was filed on November 21, 2018.  (First Am. Compl. ("FAC") (Dkt. No.

64.)  The Court held a conference on December 17, 2018, at which the Court permitted Plaintiffs

to amend a second time and indicated that any future amendment would be subject to dismissal

with prejudice.  (*See* Dkt. (entry for Dec. 17, 2018); Letter from Amy Jane Agnew, Esq. to Court

(Dkt. No. 70).)  The Second Amended Complaint was filed on February 8, 2019.  (Dkt. No. 82.)

On January 22, 2019, the Court approved a schedule for simultaneous briefing of

Defendants' first Motion To Dismiss and Plaintiffs' Motion for Pre-Certification Discovery.

(Dkt. No. 78.)  On February 22, 2019, both motions were filed.  (Dkt. Nos. 83, 86).  On March

22, 2019, Plaintiffs' filed a Cross-Motion To Amend.  (Dkt. Nos. 92.)  On June 26, 2019, the

Court issued an Opinion & Order granting in part and denying in part Defendants' first Motion

To Dismiss.  (2019 Opinion (Dkt. No. 104).)  In particular, the Court dismissed all claims against

certain DOCCS officials, claims of delayed medical treatment, and Plaintiffs' requests for

injunctive relief.  (*Id.* at 31.)  The Court also granted Plaintiffs' Cross-Motion To Amend so as to

"add claims against Defendants in their official capacities" and "to add John Morley, the current

acting CMO of DOCCS, as a Defendant."  (*Id.* at 26 n.5.)  Relatedly, the Court denied Plaintiffs'

Motion for Pre-Certification Discovery without prejudice "[i]n light of its conclusion that

Plaintiffs be permitted a final opportunity to amend."  (*Id.* at 28 n.6.)

On July 23, 2019, Plaintiffs filed the operative complaint, the Third Amended Complaint.

(Dkt. No. 108.)  On September 19, 2019, Plaintiffs filed a letter seeking leave to file a fourth

(S.D.N.Y. Mar. 25, 2020) (dismissing an action because the plaintiff failed to offer any facts
suggesting the defendants were themselves involved in the alleged violations).

amended complaint and requesting that the Court dismiss without prejudice Plaintiff's prayers for injunctive and declaratory relief and official capacity claims against DOCCS and Morley. (Letter from Amy J. Agnew, Esq., to Court (Sept. 19, 2019) ("9/19/19 Agnew Letter") (Dkt. No. 131).)  Plaintiffs explained that as of late May 2019, DOCCS revised its catheter policy and now supplies "an adequate number of sterile, single-use catheters to the representative Plaintiffs and others similarly situated."  (*Id.* at 2).  The same day, Defendants consented to Plaintiff's filing of a fourth amended complaint, "welcome[ing] Plaintiffs' decision to abandon their injunctive relief and class action claims, and to drop [DOCCS and Morley] as parties."  (Letter from Andrew S. Amer, Esq., to Court (Sept. 19, 2019) (Dkt. No. 134).)

On September 25, 2019, Plaintiffs filed their purported fourth amended complaint.  (Dkt. No. 138.)  The next day, Defendants filed a letter response, explaining that while they had "previously consented to Plaintiffs' filing the prior version of the proposed fourth amended complaint because it merely eliminated claims and defendants without adding any new substantive allegations," Defendants now opposed granting Plaintiffs' leave to amend because "Plaintiffs' revised draft of their proposed fourth amended complaint adds two new defendants and new substantive allegations."  (Letter from Andrew S. Amer, Esq., to Court (Sept. 26, 2019) (Dkt. No. 139).)  On October 4, 2019, Defendants filed an additional letter further explaining their opposition to Plaintiffs filing a fourth amended complaint.  (Dkt. No. 142.)  On October 5, 2019, Plaintiffs filed a letter reply, arguing that they should be permitted to proceed based on the proffered fourth amended complaint.  (Dkt. No. 143.)  On October 7, 2019, the Court denied Plaintiffs leave to proceed with the fourth amended complaint, and the Parties agreed to proceed based on the Third Amended Complaint.  (Dkt. Nos. 144–48.)

On November 4, 2019, Plaintiffs filed a letter seeking leave for the intervention of a

third-party (and potential class member), David Kornell ("Kornell"), and alleging that Kornell had been told by an unidentified individual that "he would receive no more than three catheters per day as it was 'the new policy.'"  (Letter from Amy J. Agnew, Esq., to Court (Nov. 4, 2019) (Dkt. No. 152).)  Three days later, Defendants responded, arguing that the proposed intervention was "a back-door attempt to amend," and that because Plaintiffs have conceded "that the current DOCCS catheter distribution policy provides them with a sufficient amount of catheters and supplies," Kornell had no interest in Plaintiffs' remaining claims.  (Letter from Andrew S. Amer, Esq., to Court (Oct. 7, 2019) (Dkt. No. 153).)  The same day, the Court denied Plaintiffs' request, explaining that Plaintiffs' counsel is "free to file other lawsuits on behalf of other inmates who claim that DOCCS' catheter policy denies them their constitutional rights."  (Dkt. No. 154.)

On November 22, 2019, Defendants filed the instant Motion To Dismiss and accompanying papers.  (Not. of Mot.; Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 156).)  On December 19, 2019, Plaintiffs filed their Opposition.  (Pls.' Mem.; Decl. of Hugh Knight ("Knight Decl.") (Dkt. No. 158); Decl. of David Kornell ("Kornell Decl.") (Dkt. No. 159); Decl. of Amy J. Agnew, Esq. (Dkt. No. 160)).  On January 10, 2020, Defendants filed their Reply.  (Reply Mem. of Law in Further Supp. of Mot. ("Defs.' Reply Mem.") (Dkt. No. 162); Decl. of John Morley ("Morley Decl.") (Dkt. No. 161).  Four days later, Plaintiffs filed a clarification and a signed version of the Kornell Declaration.  (Dkt. Nos. 163–64.)

## II. Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

11

elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(citations, quotation marks, and alterations omitted).  Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked

assertions devoid of further factual enhancement."  *Id.* (quotation marks and alteration omitted).

Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the

speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that

is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the

line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556

U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense.  But where the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the

pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R.

Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the

hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery

for a plaintiff armed with nothing more than conclusions.").

　　　　In considering a motion to dismiss, the Court "must accept as true all of the factual

allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per

curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same).  Further, "[f]or the

purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in

favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted).

> ### B.  Defendants' Motion To Dismiss

Defendants argue that DOCCS is shielded by sovereign immunity; that claims for prospective injunctive and declaratory relief fail because Plaintiffs do not allege any ongoing federal violation; that the request for class certification fails because the named Plaintiffs (who are currently receiving sufficient catheters and supplies) cannot adequately represent the putative class members; that all allegations fail to satisfy either the objective or subjective elements of the deliberate indifference test; and the TAC fails to adequately allege the personal involvement of Morley or Koenigsmann in prescribing (or failing to properly prescribe) catheters to Plaintiffs. (*See generally* Defs.' Mem.)  The Court addresses these arguments only to the extent necessary for resolving the instant Motion.

> #### 1.  Damages Claims Against DOCCS

"[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity . . . ." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (citation and quotation marks omitted).  It is well-established that "New York has not waived its Eleventh Amendment immunity to suit in federal court, and [that] Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983." *Megginson v. New York*, No. 19-CV-7583,

2019 WL 4194497, at *1 (S.D.N.Y. Sept. 4, 2019) (citation omitted); *see also Holmes v. Caliber Home Loans, Inc.*, No. 16-CV-3344, 2017 WL 3267766, at *5 (S.D.N.Y. July 31, 2017) (explaining that "New York State has not consented to being sued in federal court" and that § 1983 "did not abrogate New York's sovereign immunity"(citation omitted)).  Moreover, "[t]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state."  *Gollomp*, 568 F.3d at 366 (citation omitted).  Accordingly, because the Eleventh Amendment shields DOCCS and its officials (when sued in their official capacities) from suit for damages, all such claims must be dismissed.  *See Megginson*, 2019 WL 4194497, at *1 (dismissing § 1983 claims against the State of New York and DOCCS as barred by the Eleventh Amendment); *De Figueroa v. New York*, 403 F. Supp. 3d 133, 150 (E.D.N.Y. 2019) (explaining that New York's sovereign immunity extends to state officials sued in their official capacities); *Whitley v. Bowden*, No. 17-CV-3564, 2018 WL 2170313, at *3 (S.D.N.Y. May 10, 2018) (explaining that suits against DOCCS were barred by the Eleventh Amendment and therefore dismissed).

## 2. *Ex parte Young* claims

Although the Eleventh Amendment generally bars suits against states and their instrumentalities, the Supreme Court has created an exception for suits seeking prospective relief for ongoing violations of federal law (the doctrine of "*Ex parte Young*").  *See State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) ("[A] plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law." (quotation marks and citation omitted)); *see also Ex parte Young*, 209 U.S. 123, 155–56 (1908) ("[I]ndividuals who, as officers of the state . . . threaten and are about to commence proceedings, either of a civil or criminal

nature, to enforce against parties affected [by] an unconstitutional act, violating the Federal

Constitution, may be enjoined by a Federal court of equity from such action.").  "In determining

whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need

only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation

of federal law and seeks relief properly characterized as prospective."  *Verizon Md. Inc. v. Pub.*

*Serv. Comm'n of Md.*, 535 U.S. 635, 636 (2002) (citation and quotation marks omitted).

Crucially, where the alleged violation has ceased, past wrongs "do[] not justify an application of

*Ex parte Young*."  *Ford v. Reynolds*, 316 F.3d 351, 355 (2d Cir. 2003); *see also Morales v. Trans*

*World Airlines, Inc.*, 504 U.S. 374, 382 (1992) (explaining that *Ex parte Young* permits

injunctions against state actors only where their violations of state law are "imminent" and that

"a conjectural injury cannot warrant equitable relief") (citations omitted); *KM Enters., Inc. v.*

*McDonald*, No. 11-CV-5098, 2012 WL 4472010, at *11 (E.D.N.Y. Sept. 25, 2012) (explaining

that *Ex parte Young* requires a plaintiff to "assert a likelihood that it will be subjected to a similar

violation in the future"(citation omitted)); *Goodspeed Airport, LLC v. E. Haddam Inland*

*Wetlands & Watercourses Comm'n*, 632 F. Supp. 2d 185, 188 (D. Conn. 2009) (explaining that

the *Ex parte Young* exception applies only "where state officials are actively violating federal

law or imminently threatening acts that the plaintiff challenges as unconstitutional," and not

where defendants simply "*could* act" in a manner that violates federal law (emphasis in original)

(citation omitted)).

  Here, the TAC repeatedly acknowledges that all alleged constitutional violations

occurred in the past.  For example, Plaintiffs acknowledge that "since filing of the instant action,

Defendants have started providing the three representative plaintiffs with an appropriate number

of daily sterile, single-use catheters."  (TAC ¶ 80 n.1; *see also id.* ¶¶ 175, 221, 286.)  Moreover,

Plaintiffs fail to allege any facts indicating that Defendants are likely to renew any such violations.  (*See generally* TAC.)  Additionally, in a letter to the Court, Plaintiffs have conceded that, as of late May 2019, DOCCS revised its catheter policy and now supplies "an adequate number of sterile, single-use catheters to the representative Plaintiffs and others similarly situated." (9/19/19 Agnew Letter 2).  Plaintiffs therefore fail to allege, and even affirmatively deny, the existence of an "ongoing violation of federal law" required to invoke the *Ex parte Young* exception to Eleventh Amendment immunity.  *Verizon Md.*, 535 U.S. 635 (2002); *see also Vega v. Semple*, --- F.3d --- , No. 18-3176-pr, 2020 WL 3494317, at *15 (2d Cir. June 29, 2020) (explaining that *Ex parte Young* does not permit suits absent an ongoing violation of federal law, even where the requested relief is prospective).  Accordingly, because Plaintiffs "can no longer assert a claim for prospective injunctive relief premised on a continuing violation of federal law," all claims against Defendants in their official capacities must be dismissed.  *Pierce v. Semple*, No. 18-CV-1858, 2020 WL 229605, at *4 (D. Conn. Jan. 15, 2020).[3]

In seeking to avoid this conclusion, Plaintiffs advance two arguments.  First, Plaintiffs submit an affidavit from Knight seeking to backtrack on prior concessions and argue that the alleged constitutional violation is "ongoing."[4]  In his affidavit, Knight describes his recent

---

[3] The Court notes that Plaintiffs (initially) accepted DOCCS policy change as sufficient, and even requested that their prayers for injunctive and declaratory relief and official capacity claims against DOCCS and Morley be dismissed.  (9/19/19 Agnew Letter.)  It was only after Defendants refused to consent to Plaintiffs' filing new substantive claims in a fourth amended complaint that Plaintiffs suddenly backtracked and insisted on pursuing their claims for injunctive relief.

[4] "Eleventh Amendment [immunity] is jurisdictional in that it limits a federal court's judicial power, and may be invoked at any stage of the proceedings."  *McGinty v. New York*, 251 F.3d 84, 94 (2d Cir. 2001) (citation omitted).  Accordingly, the Court may consider affidavits in resolving its applicability here.  *See Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) ("On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to

request for an increase from six to eight catheters per day, and Defendants' denial of the request. (Knight Decl. ¶¶ 6–8.)  However, the TAC repeatedly acknowledges that six catheters per day are sufficient.  (TAC ¶¶ 159, 163, 169, 324.)  Moreover, Knight himself admits that Defendants' refusal to provide him with more than six has not resulted in in his reusing catheters.  (Knight Decl. ¶ 8.)  Finally, Knight admits that when officers conducted a cell search, they discovered six extra catheters that he had "saved."  (*Id.* ¶ 25.)  Thus, while TAC seeks relief for a particular alleged violation, i.e., Defendants' "failure to provide five to seven sterile, single-use catheters" such that Plaintiffs are forced to reuse them, (TAC ¶¶ 316–17, 324), Knight's declaration suggests that this challenged practice is, in fact, *not* ongoing.[5]

Second, Plaintiffs argue that while no violation of federal law may "literally 'be in progress'" in this case, there is still sufficient "threat" of such a violation to permit application of *Ex parte Young*.  (*See* Pls.' Mem. 6–9.)  In support of this argument, Plaintiffs cite several cases from other Circuits suggesting varying standards of imminence for such a threat to provide a basis for prospective relief.  *See, e.g.*, *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) ("[A]t the point that a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to

---

evidence outside of the pleadings, such as affidavits . . . ." (citation omitted)).

[5] Plaintiffs have also submitted an affidavit from Kornell, alleging that he receives between 19 and 21 catheters per week.  (*See* Kornell Decl. ¶ 13.)  However, Kornell is not a plaintiff in this action, and he was housed at a different facility than Plaintiffs, (Groveland Correctional Facility), and interacted with entirely different personnel than those named in this Action.  (*See id.* ¶¶ 14–15.)  Additionally, Kornell acknowledges invoking DOCCS' catheter policy to try to change the conduct of individuals with whom he has interacted.  (*See id.* ¶ 17.)  His affidavit therefore sheds no light on whether Defendants in *this* Action are engaged in an "ongoing" violation.  Moreover, Kornell acknowledges that he does not reuse catheters (but instead limits his intake of fluids).  This too differentiates his allegations from the constitutional claims at issue in this Action.  Of course, if Kornell believes that DOCCS personnel with whom he interacts are violating his rights, he may file his own lawsuit.

satisfy this element of *Ex parte Young*." (citation omitted)); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001) ("The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent." (citation omitted)).  Regardless of the particular standard articulated in these cases, however, Plaintiffs' claims fail because they do not allege facts supporting *any* threat of a future deprivation of adequate catheters.[6]  For example, the TAC contains no allegations suggesting any plans or intentions by any Defendant to reduce Plaintiffs' allotted catheters.  (*See generally* TAC.)  Instead, Plaintiffs simply allege that the situation "could change" if Plaintiffs are transferred or policies are revised.  (TAC ¶¶ 175, 221, 286.)  This is plainly insufficient.  *See Shepard v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011) (explaining that an inmate's transfer or receipt of requested relief moots claims for declaratory and injunctive relief despite the fact that "future transfers may occur"); *Gonzalez v. Hannah*, No.

_____

[6] Plaintiffs also cite a case from the Southern District of New York, where the court held that a state parolee seeking an injunction permitting contact with his family could maintain his suit despite his parole officers having recently permitted him "unrestricted contact with his minor children." *Doe v. Annucci*, No. 14-CV-2953, 2015 WL 4393012, at *15 (S.D.N.Y. July 15, 2015).  Notably, the court observed that "until [the plaintiff] is released from parole . . ., the parole officers appear to be able, at any time, to reverse course and terminate [his] contact with [his family]." *Id.*  Moreover, the court noted that "DOCCS has changed course no fewer than four times, and has twice forbidden Doe from having any contact with his infant son," and that the "possibility that DOCCS may again reverse course and impose a new separation order, to the detriment of Doe and his family, is particularly plausible given DOCCS's history, as pled, of arbitrarily enforcing, and changing, Doe's parole conditions." *Id.* at *7, *17.  *Doe* is thus consistent with a line of district court decisions requiring plaintiffs seeking to invoke *Ex parte Young* to plausibly allege (at least) "a likelihood that he will be subjected to similar violations in the future." *Babyrev v. Lanotte*, No. 16-CV-5421, 2018 WL 388850, at *5 (S.D.N.Y. Jan. 11, 2018); *see also McDonald*, 2012 WL 4472010, at *11 ("Even with the prospective relief that the [p]laintiff is seeking, it must assert a likelihood that it will be subjected to a similar violation in the future." (citation omitted)).  Insofar as *Doe* might be read as conflating the inquiries regarding whether relief is prospective and whether a violation is ongoing, such a possibility is precluded by the Second Circuit's recent decision in *Vega*, --- F.3d at ---- , 2020 WL 3494317, at *15 (explaining that a suit cannot be maintained pursuant to *Ex parte Young* where there is no ongoing violation of federal law, even where the requested relief is prospective).

19-CV-1522, 2020 WL 3256869, at *3 (D. Conn. June 16, 2020) (explaining that an inmate's

transfer from a prison facility undermined his *Ex parte Young* claims); *Goodspeed*, 632 F. Supp.

2d at 188 (explaining that the *Ex parte Young* exception applies only where "state officials are

actively violating federal law or imminently threatening acts that the plaintiff challenges as

unconstitutional," and does not apply where plaintiff simply alleges that defendants "*could* act"

to violate federal law (emphasis in original) (citation omitted)).  Moreover, Defendants have

made clear that they will *not* resume the allegedly violative conduct.  DOCCS's current written

policy governing intermittent self-catheterization for all correctional facilities in New York State

provides that "[i]nmates are issued a limited supply of single-use sterile straight catheters to be

exchanged on a one for one basis.  Urinary catheters are not to be reused," and that "in no case

should the number of catheters dispensed require a patient to reuse a catheter."  (Morley Decl. ¶¶

5, 7.)  Such a formal policy change is sufficient to establish that allegedly wrongful conduct

"could not reasonably be expected to recur."  *Tawwab v. Metz*, 554 F.2d 22, 24 (2d Cir. 1977)

(explaining that where a "change in policy is embodied in an official prison document," the

defendants had sufficiently established mootness); *see also Granite State Outdoor Advert., Inc. v.

Town of Orange*, 303 F.3d 450, 451–52 (2d Cir. 2002) ("[T]here is no reason to think that,

having completely revised its regulations through proper procedures, the [defendant] has any

intention of returning to the prior regulatory regime."); *Inside Connect, Inc. v. Fischer*, No. 13-

CV-1138, 2014 WL 2933221, at *8 (S.D.N.Y. June 30, 2014) ("In the absence of evidence that

DOCCS might reinstate its old policies, the Court must show deference to DOCCS'[s]

representation that the offending conduct has been discontinued." (citations and quotation marks

omitted)).[7]

### 3.  Individual Capacity Claims

Plaintiffs also pursue claims against Koenigsmann, Lee, Acrish, and various John and Jane Doe DOCCS medical officials in their individual capacities.  (*See id.* ¶¶ 311–12, 321–22.) The Court addresses the claims against Koenigsmann, and then the remaining Defendants.

### a.  Koenigsmann

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted); *see also Green*, 2020 WL 1467359, at *4–5 (dismissing an action because the plaintiff failed to offer any facts suggesting the defendants' involvement in the alleged violations). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who

---

[7] Because the Court rejects Plaintiffs' requests for injunctive relief based on the inapplicability of *Ex parte Young*, it need not reach the related question of whether such requests are also moot.  Neither the Supreme Court nor the Second Circuit has addressed the relationship between the mootness of a request for injunctive relief and whether the resumption of a violation is sufficiently "threatened" for the purposes of *Ex parte Young*.  *See Doe*, 2015 WL 4393012, at *5–6, *15–17 (discussing mootness and sovereign immunity separately, but treating the inquiries as substantially identical).  The Court notes, however, that there may be procedural and substantive differences between the two questions.  For example, while a defendant bears the burden of establishing mootness, a plaintiff must establish the applicability of *Ex parte Young*. *See Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 110 (2d Cir. 2010) ("The voluntary cessation of allegedly illegal activity may render a case moot if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." (citation and quotation marks omitted); *cf. Babyrev*, 2018 WL 388850, at *5 (discussing whether a plaintiff "has sufficiently alleged a likelihood that he will be subjected to similar violations in the future" in determining the applicability of *Ex parte Young*).

> committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Grullon*, 720 F.3d at 139 (citations, alterations, and italics omitted).  In other words, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Therefore, Plaintiff must plausibly allege that Defendants' actions fall into one of the five categories identified above.  *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Here, Plaintiffs allege only that Koenigsmann was "the ultimate arbiter of medical policy" for DOCCS, and "responsible for crafting policies and procedures for medical treatment of patients in DOCCS'[s] custody."  (TAC ¶¶ 39–42.)  Crucially, however, Plaintiffs acknowledge that DOCCS's formal policies were *not* themselves the cause of the alleged constitutional violation.  Indeed, Plaintiffs allege that DOCCS's then-extant policy provided for an adequate standard of care, and that their rights were violated by other Defendants' *failure* to follow that policy.  (*See id.* ¶ 111 ("Defendants' own policy, laid out in its internal manual, . . . clearly demands that patients are supplied with a reusable catheter, lubricant, urine collection pan, gloves and a clear plastic bag for storage of the reusable catheter after washing to comply with the current standard of care.")  In other words, Plaintiffs acknowledge that DOCCS's written policy, for which Koenigsmann allegedly had ultimate responsibility, is not the source of the alleged constitutional violations.  Instead, Plaintiffs simply allege that certain doctors and mid-level clinicians—but not Koenigsmann—failed to comport with this policy.  This is plainly

insufficient.  *See Brock v. Wright*, 315 F.3d 158, 165 (2d Cir. 2003) (explaining that a defendant is not liable simply because he was a "policy maker" at the time unconstitutional acts were committed (citation omitted)).[8]  In fact, Plaintiffs fail to offer factual allegations suggesting that Koenigsman was even aware of lower-level officials' alleged failures.  On the contrary, the TAC simply points to generic references to "Albany" and then asserts Koengismann's "personal awareness of the medical needs of plaintiff class members" and his "endorse[ment] and implement[ation] a policy that limits the amount of sterile daily catheters," without offering any factual content in support.  (TAC ¶¶ 43, 46.)  Such allegations are conclusory statements that "amount to nothing more than a formulaic recitation of the elements" of a claim under 42 U.S.C. § 1983.  *Iqbal*, 556 U.S. at 681 (citation and quotation marks omitted); *see also Ceparano v. County of Suffolk*, No. 10-CV-2030, 2013 WL 6576817, at *7 (E.D.N.Y. Dec. 13, 2013) (explaining that an allegation that a defendant "creat[ed] an environment that encouraged these violations" was conclusory); *cf. McKenna v. Wright*, 386 F.3d 432, 438 (2d Cir. 2004) (explaining that a plaintiff adequately alleged a senior official's personal involvement because "allegations of improperly denied medical treatment [had] come to [the official's] attention" when the official participated in a grievance process).  Accordingly, because "mere linkage in the prison chain of command is insufficient to implicate a [senior prison official] in a § 1983 claim," all individual capacity claims against Koengismann are dismissed.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (citation and quotation marks omitted).

---

[8] While Plaintiffs cite *Brock* in support of their claims, *Brock* simply highlights the absence of factual allegations of personal involvement in this case.  In *Brock*, the defendant personally signed a revised DOCCS manual that codified a constitutionally deficient policy.  *See Brock*, 315 F.3d at 165 ("It is [the defendant's] promulgation of DOC[C]S' policy on prevention and treatment of keloids that [the plaintiff] alleges resulted in a violation of his Eighth Amendment rights.").  As discussed above, that is the opposite of what occurred here.

### b.  Lee, Acrish, and Doe Defendants

Defendants do not contest the personal involvement of Lee, Acrish, and the Doe

Defendants.  Rather they argue that claims against these Defendants fail because Plaintiffs'

claims do not satisfy the objective or subjective element of the deliberate indifference analysis.

(*See* Defs.' Mem. 17–22.)  This Court disagrees.

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of

prisoners.'"  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)

(quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  An inmate's claim of deliberate

indifference to his medical needs by those overseeing his care is analyzed under the Eighth

Amendment because it is an allegation that "conditions of confinement [are] a form of

punishment" and thus is a "violation of [the] Eighth Amendment right to be free from cruel and

unusual punishments."  *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).  To state a deliberate

indifference claim, an inmate must plausibly allege (1) "that he suffered a sufficiently serious

constitutional deprivation," and (2) that the defendants "acted with deliberate indifference."

*Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).

The first element is "objective" and requires the plaintiff show that the "alleged

deprivation of adequate medical care [is] sufficiently serious."  *Spavone*, 719 F.3d at 138

(citation and quotation marks omitted).  In other words, the plaintiff "must show that the

conditions, either alone or in combination, pose an unreasonable risk of serious damage to his

health."  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citation omitted).  Analyzing this

objective requirement involves two inquiries: "whether the prisoner was actually deprived of

adequate medical care," and "whether the inadequacy in medical care is sufficiently serious,"

which in turn "requires the court to examine how the offending conduct is inadequate and what

harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006) (citation omitted). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock*, 315 F.3d at 162. Nevertheless, the Second Circuit has offered the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Id.* (citation and quotation marks omitted).

The second element, which goes to mental state, requires the plaintiff show that prison officials were "subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138 (citation omitted). This means that the official must have "appreciate[d] the risk to which a prisoner was subjected," and have had a "subjective awareness of the harmfulness associated with those conditions." *Darnell*, 849 F.3d at 35; *see also Nielsen*, 746 F.3d at 63 ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (citation and quotation marks omitted)). In other words, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280 (citation omitted). An official's awareness of the risk of serious harm can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). However, "mere negligence" is insufficient to state a claim for deliberate indifference. *Walker*, 717 F.3d at 125 (quoting

*Farmer*, 511 U.S. at 835). Neither does "mere disagreement over the proper treatment . . . create a constitutional claim"; "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

Under these standards, Plaintiffs have adequately pleaded Eighth Amendment violations. First, Plaintiffs have alleged that they received insufficient catheters over an extended period and were thus forced to reuse single-use catheters. (TAC ¶¶ 133–34, 198, 247.) Relatedly, they have alleged that the insufficient provision of catheters resulted in substantial pain, (*id.* ¶¶ 88, 203, 259, 265–69), multiple trips to the infirmary and emergency room, (*id.* ¶¶ 154, 156, 172, 182, 204, 208, 235, 324–42), and repeated objections and criticism from medical professionals, (*id.* ¶¶ 160, 215, 262). Accordingly, Plaintiffs have adequately alleged that they were "actually deprived of adequate medical care," and that the "the inadequacy in medical care is sufficiently serious." *Salahuddin*, 467 F.3d at 279–80; *see also Brock*, 315 F.3d at 162 (listing "[e]ffects [on] daily activities," "the existence of chronic and substantial pain," and the views of a "reasonable doctor or patient" as indicators of whether a deprivation of medical care is sufficiently serious (quotation marks omitted)).

Second, Plaintiffs have adequately alleged that Defendants were "aware[] of the harmfulness associated with" their failure to provide adequate catheters. *Darnell*, 849 F.3d at 35. In particular, Plaintiffs allege that Knight "repeatedly requested" additional catheters from Lee, (*id.* ¶¶ 147); that Lee received a recommendation of Knight's urologist to provide six catheters per day, yet only increased Knight's daily supply to four, and only did so temporarily, before he again reduced Knight's supply to one per day, (SAC ¶¶ 158–66); that Lee provided Stewart with only three catheters per day despite Stewart's complaints, and that he subsequently decreased

Stewart's supply, (*id.* ¶¶ 189, 194–98); and that Lee decreased Dickinson's supply of catheters from three per day to two per day within weeks of having admitted Dickinson to the infirmary due to a UTI, (*id.* ¶¶ 240–47). Similarly, Plaintiffs allege that Acrish prescribed Dickinson only two catheters per day, and then reduced that supply to one per day after Dickinson complained. (*Id.* ¶¶ 275–79.) Moreover, Plaintiffs allege that the relevant standard of care, and even the packaging of the catheters distributed by DOCCS, makes clear that reuse of the distributed catheters was medically improper. (*See id.* ¶¶ 94–109.) Accordingly, Plaintiffs have adequately pleaded that Defendants were subjectively aware of Plaintiffs' medical needs and the toll taken by depriving Plaintiffs of adequate medical care. A fact-finder could infer from such conduct that Defendants "conscious[ly] cho[s]e . . . [an] easier and less efficacious treatment plan[]" that would "likely cause pain and other medical problems." *Brock*, 315 F.3d at 167 (citation and quotation marks omitted); *see also Farmer*, 511 U.S. at 842 (explaining that an official's awareness of the risk of serious harm can be established through "inference from circumstantial evidence"); *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005) ("[W]e have previously held that a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians." (citation omitted)). The Court therefore declines to dismiss the individual capacity claims against Lee, Acrish, and the Doe Defendants on this basis.[9]

---

[9] In three sentences, Defendants cursorily urge the Court to dismiss Plaintiffs' putative class action claims because while Plaintiffs acknowledge they themselves are currently receiving an adequate supply of catheters, they have also alleged that the putative class members "suffer repeat UTIs, related infections, hospitalizations and pain and suffering due to the lack of adequate supplies." (TAC ¶ 293.) Thus, argue Defendants, Plaintiffs "do not possess the same interest or suffer the same injury as the class members." (Defs.' Mem. 16.) The argument is strange, however, as both Defendants and Plaintiffs acknowledge that DOCCS has altered its catheter policy not just with respect to the named Plaintiffs, but throughout the New York prison system. (*See* Defs.' Reply Mem. 1–7; 9/19/19 Agnew Letter.) Moreover, after this Opinion &

## III.  Conclusion

For the reasons stated above, Defendants' Motion is granted in part and denied in part.

All claims against DOCCS (including all official capacity claims) are dismissed, as are all claims against Koenigsmann.  Because Plaintiffs have already received several opportunities to amend, dismissal of these claims is with prejudice.  Plaintiffs may continue to pursue their claims against the remaining Defendants (Lee, Acrish, and any Doe Defendants) in their individual capacities.

The Clerk of the Court is respectfully requested to terminate the pending Motions.  (Dkt. Nos. 125, 155).


SO ORDERED.

DATED:        July 10, 2020 White
              Plains, New York

_____

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

Order is issued, Plaintiffs' only remaining claims concern retrospective relief against certain individual Defendants.  The Court lacks the ability at this point in the proceedings (prior to any discovery or relevant briefing) to evaluate whether Plaintiffs' remaining claims against the remaining Defendants meet the requirements of Fed. R. Civ. P. 23.  Accordingly, the Court declines at this time to dismiss the putative class claims against the remaining Defendants.