UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HUGH KNIGHT, *et al*,

                                        Plaintiffs,

        v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS, *et al.*,

                                        Defendants.

No. 18-CV-7172 (KMK)

OPINION & ORDER

Appearances:

Amy Jane Agnew, Esq.
Joshua Lee Morrison, Esq.
Kara Somerstein, Esq.
Law Office of Amy Jane Agnew, P.C.
New York, NY
*Counsel for Plaintiffs*

Andrew Stuart Amer, Esq.
Gee Won Cha, Esq.
Jessica Michelle Acosta-Petty Johnson, Esq.
New York State Department of Law
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Hugh Knight ("Knight"), Wayne Stewart ("Stewart"), and Shannon Dickinson

("Dickinson"; collectively, "Plaintiffs") are inmates in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS") who require intermittent

catheterization.  (Third Am. Compl. ("TAC") ¶¶ 5–10, 13–17, 20–24 (Dkt. No. 108).)  Plaintiffs

bring this Action, pursuant to 42 U.S.C. § 1983, on behalf of themselves and all others similarly

situated, against DOCCS and several DOCCS medical officials: current Chief Medical Officer

("CMO") John Morley ("Morley"); former Chief Medical Officer Carl Koenigsmann

("Koenigsmann"); Shawangunk Correctional Facility ("Shawangunk") Health Services Director

("FHSD") Chung Lee ("Lee"); Nurse Practitioner ("NP") Albert Acrish ("Acrish"); and

numerous John and Jane Doe medical professionals and administrators (the "Doe Defendants";

collectively, "Defendants").  (*Id.* ¶¶ 25–38.)[1]

Before the Court is Defendants' Motion for Summary Judgment pursuant to Federal Rule

of Civil Procedure 56 (the "Motion").  (Not. of Mot. (Dkt. No. 225).)  For the reasons that

follow, the Motion is denied.

<u>I.  Background</u>

<u>A.  Factual Background</u>

The following facts are taken from the Defendants' Statement Pursuant to Local Rule

56.1, (Defs.' Rule 56.1 Statement in Supp. of Mot. ("Defs.' 56.1") (Dkt. No. 226)), Plaintiffs'

Statement Pursuant to Local Rule 56.1, (Pl.'s Rule 56.1 Statement in Opp'n to Mot. ("Pls.'s

56.1") (Dkt. No. 242)), Defendants' Counter Statement Pursuant to Civil Rule 56.1, (Defs.'

Counter Statement in Supp. of Mot. ("Defs.' Counter 56.1") (Dkt. No. 253)), and other

documents submitted by the Parties, and are recounted "in the light most favorable to" Plaintiffs,

the non-movants.  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also*

*Johnson v. Kitt*, No. 15-CV-7823, 2021 WL 1105438, at *1 (S.D.N.Y. Mar. 23, 2021).

---

[1]  Following this Court's Opinion & Order on Defendants' Motion to Dismiss the Third Amended Complaint (the "2020 Opinion"), the remaining Defendants are Lee, Acrish, and the Doe Defendants.  (*See* Op. & Order ("2020 Op.") at 27 (Dkt. No. 168).)  n October 4, the Parties submitted a Stipulation of Voluntary Dismissal Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), voluntarily dismissing the claims of Plaintiff Wayne Stewart, as well as the class action claims.  (Dkt. No. 237.)  Thus, the remaining Plaintiffs are Knight and Dickinson.

1. General Allegations

Knight and Dickinson are Department of Corrections and Community Supervision ("DOCCS") inmates who are paraplegics and largely wheelchair bound.  (Defs.' 56.1 ¶¶ 1, 3.) Knight and Dickinson do not have control over their bladder function and thus require intermittent catherization ("IC") that is, "the insertion and removal of a catheter several times a day to empty the bladder."  (*Id*. ¶¶ 10–12.)

Two techniques of IC include the "sterile" and "clean" methods.  (*Id*. ¶ 18; Pls.' 56.1 ¶ 18.)  Sterile IC ("SIC") involves genital disinfecting and the use of a sterile catheter, catheter kits, and gloves, and it is normally done in a hospital.  (Defs.' 56.1 ¶ 19; Pls.' 56.1 ¶ 19.)  Clean IC ("CIC") involves hand washing with soap and water.  (Defs.' 56.1 ¶ 21; Pls.' 56.1 ¶ 21.)  Two techniques of CIC include the single-use method, which consists of using a new sterile catheter for each catherization, and the re-use method, which consists of washing and re-using the catheter for multiple catheterizations.  (Defs.' 56.1 ¶ 22; Pls.' 56.1 ¶ 22.)

Catheters, which require a prescription, can be either coated or uncoated.  (Defs.' 56.1 ¶¶ 23–24; Pls.' 56.1 ¶¶ 23–24.)  Uncoated catheters are commonly made of medical-grade plastic such as polyvinylchloride ("PVC"), and, following regulatory changes that were made in 2006, all uncoated PVC catheters have been labeled by manufacturers for single use.  (Defs.' 56.1 ¶¶ 25–27; Pls.' 56.1 ¶¶ 25–27.)  Re-use of catheters labeled for single use is considered off-label use.  (Defs.' 56.1 ¶ 28; Pls.' 56.1 ¶ 28.)

From 2011 through 2018, DOCCS's written policy for distributing catheters to patients who self-catheterize, which was outlined in the Communicable & Infectious Diseases: Procedure and Control Manual (the "Manual"), was to provide patients with one catheter a day on an exchange basis.  (Defs.' 56.1 ¶¶ 61–63; Pls.' 56.1 ¶¶ 61–63; *see also* Decl. of Joshua L.

Morrison, Esq. ("Morrison Decl.") Ex. 11 ("2011 DOCCS Manual") at 5 (Dkt. No. 239-11); Morrison Decl. Ex. 12 ("2018 DOCCS Manual") at 5 (Dkt. No. 239-12).)  The policy instructed inmates to wash the catheter with warm soapy water and wrap it in a clean towel or paper towel between uses.  (2011 DOCCS Manual at 5; 2018 DOCCS Manual at 5.)  The policy also instructed the facility to provide the inmate with lubricant, a urine collection pan, gloves, and a clear plastic bag.  (2011 DOCCS Manual at 5; 2018 DOCCS Manual at 5.)  In 2019, the Manual was revised to eliminate the re-use method, providing that inmates should be "issued a limited supply of single-use sterile straight catheters to be exchanged on a one for one basis" and instructing that "catheters are not to be reused."  (Defs.' 56.1 ¶¶ 64–65; Pls.' 56.1 ¶¶ 64–65; *see also* Morrison Decl. Ex. 13 ("2019 DOCCS Manual") at 8 (Dkt. No. 239-13).)

Plaintiffs also make specific allegations with respect to the treatment and provision of catheters for both Knight and Dickinson.

### 2. Knight

Lee supervised Knight's medical care from the time of Knight's transfer to Shawangunk Correctional Center ("Shawangunk") in November 2014 to Lee's retirement in November of 2019.  (Defs.' 56.1 ¶ 68; Pls.' 56.1 ¶ 68.)  Lee prescribed Knight one sterile single-use catheter per day from November 2018 through July 2019.  (Defs.' 56.1 ¶ 71; Pls.' 56.1 ¶ 71.)  Knight also alleges that he received four lubricants and four disinfectant swabs per day, but he allegedly never received any gloves or a plastic bag to store his catheters between use.  (Pls.' 56.1 ¶ 173.)  Knight also alleges that Lee "never observed Mr. Knight self-catheterize, never demonstrated or asked Mr. Knight to demonstrate how to wash and reuse catheters, never instructed Mr. Knight to measure the amount of volume of urine after he catheterized, and never discussed with Mr. Knight his catheterization schedule or specific needs."  (*Id.* ¶ 175.)  Knight further alleges that he

"continually informed" Lee that he "was not being provided enough catheters." (*Id.* ¶ 177.) Lee allegedly "ignored Mr. Knight's concerns and required him to reuse one catheter per day." (*Id.* ¶ 174.)

From 2015 to 2018, Knight alleges that he experienced frequent UTIs, and he was hospitalized twice for sepsis. In February 2015, Knight tested positive for a UTI and was treated by another medical provider. (Pls.' 56.1 ¶ 181.) In March 2016, Knight made a sick call, complaining that he had foul-smelling urine that he believed was a UTI, but he was not treated for it. (Pls.' Opp'n ¶ 186.) In December 2016, Lee diagnosed and treated Knight for a UTI. (Defs.' 56.1 ¶ 75; Pls.' 56.1 ¶ 75.) In January 2017, Knight had another UTI, which Dr. Lee treated with antibiotics. (Defs.' 56.1 ¶ 76; Pls.' 56.1 ¶ 76.) In March 2017, Knight had an asymptomatic UTI, which was left untreated in accordance with urology literature, which has found in recent years that asymptomatic UTIs should not be treated with antibiotics to avoid antibiotic resistance. (Defs.' 56.1 ¶ 77; Pls.' 56.1 ¶ 77.) In April 2017, Knight complained to sick call that he was having symptoms of a UTI, but he was not tested or treated for it. (Pls.' 56.1 ¶ 192.) In June 2017, Knight had another UTI, and Dr. Lee prescribed antibiotics. (Defs.' 56.1 ¶ 78; Pls.' 56.1 ¶ 78.)

In late May 2018, Knight was admitted to the Albany Medical Center ("AMC") with a diagnosis of sepsis due to catheter associated UTI ("CAUTI"). (Defs.' 56.1 ¶ 82; Pls.' 56.1 ¶ 82.) In July 2018, Knight was again admitted to AMC with a diagnosis of sepsis. (Defs.' 56.1 ¶ 87; Pls.' 56.1 ¶ 87.) Knight was then discharged to the Shawangunk infirmary. (Defs.' 56.1 ¶ 87; Pls.' 56.1 ¶ 87.) Included in Knight's discharge paperwork was a handwritten note that reads, "do not re-use self-caths." (Defs.' 56.1 ¶ 88; Pls.' 56.1 ¶ 88.) While Knight was in the infirmary, his catheter supply was increased to four per day. (Defs.' 56.1 ¶ 89; Pls.' 56.1 ¶ 89.)

However, Knight alleges that when he was discharged from the infirmary several days later, his catheter supply was reduced again to one per day.  (Pls.' 56.1 ¶ 89.)

In December 2018, Knight was tested and treated for another UTI.  (Pls.' 56.1 ¶ 202.) Later that month, after DOCCS changed its catheter policy, Knight began receiving six catheters per day, and his infections "significantly reduced."  (*Id.*  ¶ 203.)  In September 2019, Knight was treated for another UTI.  (*Id.* ¶ 93.)

Knight filed several grievances regarding catheters and related supplies.  Knight filed a grievance in December 2014, about a month after he arrived at Shawangunk, requesting that he be provided with antibacterial soap with which to clean his catheters between uses.  (Defs.'56.1 ¶ 116; Pls.' 56.1 ¶ 180).  Knight also filed grievances in July and August 2018, requesting that he be provided with more catheters, lubricant, swabs, and gloves.  (Defs.' 56.1 ¶ 116.)  In September 2019, Knight filed another grievance requesting more catheters and antibacterial soap.  (*Id.*)

### 3. Dickinson

Lee supervised Dickinson's medical care from Dickinson's transfer to Shawangunk in December 2016 to Dickinson's transfer to Green Haven Correctional Facility ("Green Haven") in May 2018.  (Defs.' 56.1 ¶¶ 95–100; Pls.' 56.1 ¶¶ 95–100.)  During Dickinson's time at Shawangunk, Lee ordered that he receive three catheters per day.  (Defs.' 56.1 ¶ 98; Pls.' 56.1 ¶ 98.)  Dickinson allegedly did not receive any lubricant from December 2016 to August 2017. (Pls.' 56.1 ¶ 220.)  Dickinson alleges that Lee never assessed him for his personal catheterization needs.  (*Id.* ¶ 213.)  Dickinson also alleges that when he asked Lee for more catheters and supplies, Lee "did not respond to his concerns and told him whatever catheters you get in the bag

is the amount you are going to receive." (*Id.*)  Dickinson allegedly raised his concerns with Lee every time they met.  (*Id.* ¶ 214.)

Like Knight, Dickinson experienced several UTIs while at Shawangunk.  He tested positive for UTIs in February 2017, July 2017, and October 2017.  (*Id.* ¶¶ 216, 218, 221.)  In January 2018, Dickinson was admitted to AMC for urological issues, including a possible UTI.  (Defs.' 56.1 ¶ 99; Pls.' 56.1 ¶¶ 99, 222.)  Following Dickinson's discharge from the hospital, he stayed in the infirmary for a day—and received five catheters on that day.  (Defs.' 56.1 ¶ 98; Pls.' 56.1 ¶ 98.)  After leaving the infirmary, Dickinson alleges that his catheter supply was reduced to two per day.  (Defs.' 56.1 ¶ 98; Pls.' 56.1 ¶ 98.)

In May 2018, Dickinson was transferred to Green Haven, and Acrish was assigned as his medical care provider.  (Defs.' 56.1 ¶ 100; Pls.' 56.1 ¶ 100.)  At Green Haven, Dickinson alleges that he received one catheter, one lubricant, and one glove per day.  (Pls.' 56.1 ¶ 100.)  Dickinson also alleges that Acrish never observed Dickinson self-catheterize, nor did he demonstrate to Dickinson how to re-use and wash catheters.  (*Id.* ¶ 232.)  In July 2018, Dickinson complained to medical staff that he felt symptoms of a UTI, and this diagnosis was confirmed weeks later in August 2018.  (*Id.* ¶¶ 234–35.)  In October 2018, Dickinson had a cystoscopy, which revealed "beginnings of false passages evidence where he was having traumatic catheterizations."  (*Id.* ¶ 239.)  In January 2019, Dickinson reported feeling symptoms of a UTI but was never tested.  (*Id.* ¶ 242.)  In March 2019, Dickinson tested positive for and was treated for a UTI.  (*Id.* ¶ 244.)

In March 2019, Dickinson was transferred again to Five Points Correctional Facility ("Five Points").  (Defs.' 56.1 ¶ 103; Pls.' 56.1 ¶ 103.)  Since arriving at Five Points, Dickinson has been provided with sufficient catheters so as not to have to re-use them.  (Defs.' 56.1 ¶ 103;

Pls.' 56.1 ¶ 103.)  Dickinson alleges that although his "number of UTIs did not drastically improve after he was allowed to stop reusing catheters, Mr. Dickinson's prior traumatic catheterizations, false passages, and testicular inflammation caused by inadequate catheters and supplies predisposed him to a higher likelihood of future infections."  (Pls.' 56.1 ¶ 245.)

Like Knight, Dickinson also filed grievances requesting additional catheters.  In March, April and September 2018, Dickinson wrote grievances requesting more catheters.  (Defs.' 56.1 ¶ 119; *see also* Decl. of Michael Cunningham ("Cunningham Decl.") Ex. G ("Dickinson Grievance Mar. 2018") (Dkt. 232-7).)  According to Dickinson, he received a response in November 2018 stating, "the grievant's chart indicates he should be receiving 14 catheters per week and should bring any discrepancy to the staff's attention."  (Pls.' 56.1 ¶ 238.)  Dickinson wrote in his appeal, "I do not receive 14 catheters a week and when I asked the nurse on 12/1/2018 about this I was told 'whatever is in the bag is all you get,' but I only received 7 a week."  (*Id.*)

### 4. Causes of Action

Plaintiffs bring two Eighth Amendment claims pursuant to 42 U.S.C. §1983.  The first cause of action alleges that Defendants exhibited deliberate indifference to Plaintiffs' health by "adopt[ing] and implement[ing] a policy which restricts the number of sterile, single-use catheters to the bare minimum and demands patients rewash catheters," and by "allow[ing] the deprivation of an adequate number of sterile catheters despite knowing that patients suffer from UTIs and hospitalizations as a result of infections from unsterile catheterizations."  (TAC ¶¶ 317–18.)  Plaintiffs further allege that, "[d]ue to the insufficient amount of single use catheters or sterilizing supplies," Plaintiffs "suffer[ed] avoidable and severe illnesses including UTIs, urosepsis, and other related infections and illnesses.  (*Id*. ¶ 319.)  The second cause of action,

which is not readily distinguishable from the first, alleges that Defendants denied Plaintiffs

adequate medical care by "fail[ing] to provide five to seven sterile, single-use catheters" and

accompanying "supplies." (*Id*. ¶ 324, 326.)  Following the Court's 2020 Opinion, these claims

remain against Defendants Lee and Acrish in their individual capacities, as well as against

various John and Jane Doe DOCCS medical officials in their individual capacities.  (2020 Op. at

27.)

B.  Procedural History

Because the procedural background of this Action has been summarized in this Court's

previous Opinion & Order on Defendants' Motion to Dismiss the Second Amended Complaint

(the "2019 Opinion") and Opinion & Order on Defendants' Motion to Dismiss the Third

Amended Complaint (the "2020 Opinion"), this Court supplements the procedural history of the

case since the issuance of the 2020 Opinion.  (*See* Op. & Order ("2019 Op.") at 9–10 (Dkt. No.

104); 2020 Op. at 9–11).)

On August 14, 2020, Defendant Acrish filed an Answer to Plaintiffs' Third Amended

Complaint.  (Dkt. No. 172.)  On August 14, Defendant Lee filed an Answer to Plaintiff's Third

Amended Complaint.  (Dkt. No. 173.)  The Court adopted a Case Management Order on

September 2, 2020.  (Dkt. No. 181.)  On December 12, 2020, Plaintiffs requested an extension of

discovery deadlines, (Dkt. No. 186), which the Court granted, (Dkt. No. 187.)  On January 22,

2021, Defendants requested another extension of discovery deadliness, (Dkt. No. 195), which the

Court granted, (Dkt. No. 196.)

On June 1, 2021, Defendants filed a pre-motion letter seeking leave to file and outlining

the grounds for the instant Motion.  (Dkt. 215.)  Plaintiffs responded on June 7, 2021.  (Dkt. No.

217.)  The Court held a pre-motion conference on June 9, 2021, (Dkt. (minute entry for Jun. 9,

2021)), and adopted a briefing schedule on June 11, 2021, (Dkt. No. 218).  On August 11, 2021, Defendants requested leave to file excess pages in their moving brief, (Dkt. No. 222), which the Court granted, (Dkt. No. 223).

On August 20, 2021, Defendants Lee and Acrish filed their Motion for Summary Judgment and accompanying papers.  (Dkt. Nos. 225–234.)  On September 13, 2021, Plaintiff filed a request for an extension to respond to Defendants' Motion, (Dkt. No. 235), which the Court granted, (Dkt. No. 236).  On October 4, 2021, the Parties submitted a Stipulation of Voluntary Dismissal Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), voluntarily dismissing the claims of Plaintiff Wayne Stewart, as well as the class action claims.  (Dkt. No. 237.)  On October 4, 5, 6, 11, 14, and 15, Plaintiffs filed their Opposition and accompanying papers.  (Dkt. Nos. 238–247, 250.)  On October 14, 2021, Defendants requested leave to file excess pages in reply to Plaintiff's Opposition, (Dkt. No. 248,) which the Court granted, (Dkt. No. 249.)  Defendants filed their Reply and accompanying papers on November 3, 2021.  (Dkt. Nos. 251–253.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River*

*v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same); *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

 "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *Brod*, 653 F.3d at 164 (quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting FED. R. CIV. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (quotation marks omitted)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage."  *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of

credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)).  Where the evidence presents "a question of 'he said, she said,'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side ... tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court").  And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment*." Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact").

B. Analysis

    1. Deliberate Indifference to Medical Needs

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  Such medical needs include "psychiatric or mental health care." *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989).  To state a deliberate indifference claim, Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that Defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (quotation marks omitted).  In other words, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Shult*, 717 F.3d 119, 125 (2d Cir. 2013). Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280.

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138.  This means that Defendants must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions." *Darnell v. Pineiro,* 849 F.3d 17, 35 (2d Cir. 2017); *see also Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (quotation marks omitted)).  In other words, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* (quotation marks omitted).  A defendant's awareness of the risk of serious harm can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).  However, "mere negligence" is insufficient to state a claim for deliberate

indifference. *Walker*, 717 F.3d at 125 (quotation marks omitted).  Neither does "mere disagreement over the proper treatment . . . create a constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

a. Objective Prong

Defendants argue that Plaintiffs cannot meet the objective prong of the test, because the harm Plaintiffs suffered was not "sufficiently serious" and because Lee and Acrish provided Plaintiffs with "more than adequate" care.  (Defs.' Mem. in Supp. of Mot. ("Defs.' Mem.") at 18–19 (Dkt. No. 234).)  In support of this argument, Defendants rely on various articles published in peer-reviewed medical journals discussing and debating the re-use of catheters. (*See id.*)  Plaintiffs argue that these articles are inadmissible hearsay that the Court cannot rely on when deciding Defendants' Motion.  (*See* Pls.' Mem. in Opp'n to Defs.' Mot. ("Pls.' Opp'n") at 14–15 (Dkt. No. 244).)  Defendants counter that these articles are admissible under Federal Rule of Evidence 803(18).  (Defs.' Reply Mem. in Supp. of Mot. ("Defs.' Reply") at 6–9 (Dkt. No. 251).)

As an initial matter, Federal Rule of Evidence 803(18) "permits the reading into evidence of statements in learned treatises, periodicals or pamphlets if '(A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and (B) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.'" *Glowczenski v. Taser Int'l, Inc.*, 928 F. Supp. 2d 564, 572 (E.D.N.Y. 2013), *aff'd in part, dismissed in part on other grounds*, 594 F. App'x 723 (2d Cir. 2014) (quoting Fed. R. Evid. 803(18)).  However, "the

15

potential establishment of the articles at trial as reliable authorities does not make them

admissible as evidence on the current [M]otion for [S]ummary [J]udgment." *Id.*; *see also*

*Outerbridge v. City of New York*, No. 13-CV-5459, 2015 WL 5813387, at \*4 (S.D.N.Y. Sept. 30,

2015) ("It is well-established that newspaper articles offered for the truth of the matters asserted

therein are inadmissible hearsay that may not be considered by [] [c]ourt[s] in deciding a motion

for summary judgment." (quotation marks omitted)).  This is because, even if Defendants could

establish the two elements required by 803(18), the rule would still only permit the reading into

evidence of certain statements within the articles during the expert witnesses' testimony; it

would not permit the admission of the articles themselves into evidence.  *Mugavero v. Arms*

*Acres, Inc*., No. 03-CV-05724, 2009 WL 1904548, at \*6 (S.D.N.Y. July 1, 2009) ("Rule 803(18)

. . . contemplates the admission of statements in treatises only through the testimony of an expert

witness . . . [and] explicitly states that the statements themselves, e.g., excerpts from treatises,

may not be received as exhibits.").  Accordingly, the Court will consider the articles only to the

extent that they are mentioned in the deposition testimony of the expert witnesses.

The Court will address the second inquiry of the objective prong first.  As discussed

above, the second inquiry of the objective prong asks "whether the inadequacy in medical care is

sufficiently serious."  *Salahuddin*, 467 F.3d at 279.  "There is no settled, precise metric to guide

a court in its estimation of the seriousness of a prisoner's medical condition."  *Brock v. Wright*,

315 F.3d 158, 162 (2d Cir. 2003).  Nevertheless, the Second Circuit has suggested the following

non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1)

whether a reasonable doctor or patient would perceive the medical need in question as 'important

and worthy of comment or treatment,' (2) whether the medical condition significantly affects

daily activities, and (3) 'the existence of chronic and substantial pain.'"  *Id.* (quoting *Chance*,

143 F.3d at 702).  Plaintiffs, who are paraplegics requiring the use of a catheter to urinate, and who suffer from frequent UTIs, (*see generally* TAC; Pls.' 56.1), allege that they suffer from a serious medical condition, the inadequate treatment of which is sufficiently serious, (Pls.' Opp'n at 16.)[2]  There is ample caselaw to support Plaintiffs' claim.  *See, e.g.*, *Dumel v. Westchester Cty.*, No. 19-CV-2161, 2021 WL 738365, at *11 (S.D.N.Y. Feb. 25, 2021) (finding the plaintiff's medical condition, which included pain during urination and swollen and tender testicles, to be sufficiently serious); *West v. Goord*, No. 05-CV-447, 2017 WL 3251253, at *15 (W.D.N.Y. July 31, 2017) ("[U]rinary pain and blood in the urine can present a sufficiently serious condition capable of causing extreme pain."); *James v. Kaskiw*, No. 13-CV-526, 2016 WL 770193, at *5 (N.D.N.Y. Jan. 28, 2016) (assuming that the plaintiff's urinary tract infection and kidney stones, which caused various urinary complications, constituted serious medical conditions); *Woods v. City of Utica*, 902 F. Supp. 2d 273, 283 (N.D.N.Y. 2012) ("The [] defendants do not seriously dispute that [the plaintiff], a paraplegic who requires the use of a catheter to urinate . . . , suffers from a serious medical condition.").

Turning back to the first inquiry of the objective prong, the Parties dispute whether Plaintiffs were "actually deprived of adequate medical care."  *Salahuddin*, 467 F.3d at 279.  Defendants contend that "the treatment provided by [] Lee and [] Acrish was more than adequate."  (Defs.' Mem. at 19.)  However, the Court finds that there is a genuine dispute of material fact as to whether the medical care provided by Defendants was in fact adequate.

---

[2]  Plaintiffs state that Defendants do not "seriously contend[] that Plaintiffs did not truly suffer . . . ."  (Pls.' Opp'n at 16.)  The Court agrees that Defendants do not appear to dispute the seriousness of Plaintiffs' condition.  However, for completeness, the Court will address this point.

On the one hand, Defendants' expert witness opine that Defendants provided adequate medical care to Plaintiffs.  Specifically, Dr. George Klein ("Dr. Klein"), a physician at the Mt. Sinai and Lenox Hill hospitals specializing in urology, stated that the re-use of "uncoated PVC catheters is common and well-accepted in the field of urology," (Decl. of George Klein, M.D. ("Klein Decl.") ¶¶ 1, 2, 14 (Dkt. No. 230).)  Though Dr. Klein concedes that in "more recent years that has been a debate within the medical community on whether CIC should be practiced using a new sterile catheter for each catherization instead of washing and reusing catheters," (*id.* ¶ 10), Dr. Klein nevertheless noted that he "routinely instruct[s] patients who practice CIC to wash and reuse catheters," (*id.* ¶ 14.)  In his expert report, Dr. Klein also stated:

> Based on my 40+ years of experience as a clinician in the field or urology and my review of the medical literature . . . , it is my opinion that the DOCCS policy for CIC contained in the 2011 and 2018 manuals, which provides inmates with at least one sterile catheter per day that they must wash with warm soap and water and reuse, comports in all respects with the well-accepted standard of medical care for patients with neurogenic bladders requiring self-catherization.

(Reply Decl. of Andrew Amer, Esq. ("Amer Reply Decl.") Ex. C ("Klein Expert Report") at 4 (Dkt. No. 252-3).)  Accordingly, Dr. Klein found that, in following the Manual by providing Plaintiffs "with at least one" catheter per day, Defendants "met or exceeded the accepted standard of medical care for patients with neurogenic bladders."  (*Id.* at 6.)  Dr. Klein also stated that, in his opinion, the two packets of lubricant provided to each Plaintiff per day was "more than sufficient."  (*Id.* at 7.)

On the other hand, Plaintiffs expert witnesses opine that the medical care provided by Defendants was inadequate.  Plaintiff's expert witness Dr. Diane Newman ("Dr. Newman"), an Adjunct Professor of Urology at the University of Pennsylvania and urology nurse, states that "[t]he practice of reusing catheters has changed over the past ten years, and most patients . . . do not re-use the same catheter for multiple catheterizations."  (Decl. of Diane Newman, M.D.

("Newman Decl.") ¶¶ 2, 3, 13 (Dkt. No. 238).) She further stated that "[a] nurse would never re-use a product like a catheter inside a patient's bladder out of concern about complications." (*Id.* ¶ 14.) Jean Vacca ("Vacca"), a registered nurse employed by DOCSS, echoed Dr. Newman's opinion in a deposition. (*See generally* Morrison Decl. Ex. 8 ("Vacca Dep.") (Dkt. No. 239-8).) Specifically, she stated that in trainings she has attended, the "recommendation was not to reuse single use catheters, ever. (*Id.* at 104.) Vacca further explained that the "standard of care" for "straight catheterization" is to "use a single use catheter as a single use catheter." (*Id.* at 104.) Vacca also stated in her deposition that in other DOCCS facilities in which she worked, patients were never directed to re-use single-use catheters. (*See id.* at 103.) Further, Vacca stated that she personally brought her concerns about re-use of single-use catheters to the attention of Dr. Lee "multiple times," (*Id.* at 121), and that his reaction was "[a]long the lines of so what? They are prisoners," (*id.* at 122).[3]

Dr. Newman also stated, "in my review of Mr. Knight [] and Mr. Dickinson's records, it does not appear as though catheter supplies (catheters, lubricant, gloves) were adequate for the number of times these men needed to perform catherization to ensure adequate bladder emptying and prevent catheter-associated complications." (Newman Decl. Ex 2 ("Newman May 2021 Expert Report") at 2 (Dkt. No. 238-2).) Further, she stated that she "strongly disagree[s] with [Dr. Klein's] opinion as to current literature and medical guidelines on multiple re-use of

---

[3] The Court notes that this is only one example of problematic language allegedly used by both Defendants in reference to Plaintiffs and their medical requests. For example, Acrish stated in his deposition, "If [Dickinson] really had chronic UTIs he would tell me, and he did not mention any of that, so you are dealing with an adult not a child. So if he has a problem he tells me." (Morrison Decl. Ex. 10 ("Acrish Dep.") at 76 (Dkt. No. 239-10).) Similarly, Lee stated in his deposition, "I didn't think that five or ten [catheters] or giving [Knight] as many [catheters] as he wanted would be reasonable. It's the same way that when a son asks a mother for something, his mother won't give her son everything all the time." (Morrison Decl. Ex. 6 ("Lee Dep.") at 111 (Dkt. No. 239-6).)

catheters . . . ."  (Newman Decl. Ex 3 ("Newman June 2021 Expert Report") at 1 (Dkt. No. 238-3).)

Plaintiffs' other expert witness, Dr. Ray Sultan ("Dr. Sultan"), a physician specializing in urology at Mount Sinai South Nassau Hospital, noted that "Plaintiffs resided in cells that were less than ideal environments for self-catherization, especially reuse, . . . making the introduction of bacteria and contamination more of a concern."  (Decl. of Ray Sultan, M.D. ("Sultan Decl.") ¶¶ 2, 59–60 (Dkt. No. 250).)  This is partially because "catheters are over a foot long and the sinks in a cell are not large enough for a catheter to be washed and rinsed with water flowering through the catheter without it contacting and being contaminated by the sink base."  For many of the same reasons as Dr. Newman, Dr. Sultan concluded:

> Based on my review of the medical records and related documents along with my knowledge, skill, experience, training, and education it is my opinion that within a reasonable degree of medical certainty the medical treatment rendered by Defendant[s] Lee [and Acrish] was below the standard of care and caused Plaintiffs significant harm, pain, and injury.

(*Id.* ¶¶ 10–11.)  Specifically, he noted that Defendants "did not order an adequate supply of catheters and catherization supplies for the Plaintiffs, forcing them to reuse sterile, single-use catheters."  (*Id.*)

In sum, a genuine dispute of material fact exists as to whether Defendants provided adequate medical care to Plaintiffs, and thus summary judgment is inappropriate on this claim. *See Rouse v. Vanier*, No. 19-CV-06862, 2021 WL 5544935, at *5 (W.D.N.Y. Nov. 27, 2021) ("The conflicting expert opinions before the Court on the instant motion demonstrate the existence of genuine issues of material fact, making summary judgment inappropriate."); *Realtime Data, LLC v. Stanley*, 897 F. Supp. 2d 146, 153 (S.D.N.Y. 2012) ("[W]hen there are dueling experts, both of whom have put forward opinions in contradiction with each other, and

when those opinions are important to resolution of a material factual dispute, summary judgment

may not be appropriate."); *see also In re Refco Inc. Sec. Litig.*, No. 07-CV-8663, 2011 WL

13243784, at *16 n.21 (S.D.N.Y. Mar. 28, 2011) (declining to grant summary judgment because

of a battle of the experts).

　　　　　　　　b. Subjective Prong

　　　　As for the subjective prong, the Second Circuit has denied summary judgment in a

factually similar case.  In *Johnson v. Wright*, the Second Circuit found that there was a genuine

dispute of material fact precluding summary judgment where the defendant prison officials, in

accordance with prison policy, refused to prescribe medication to the inmate plaintiff.  *See* 412

F.3d 398 (2d Cir. 2005).  The Second Circuit's reasoning is particularly relevant to the instant

case:

> On the one hand, we believe . . . [a] jury could well find that the defendants rejected the
> requests to treat [the] plaintiff with [a particular medication], not because the defendants
> were in any way indifferent to [the] plaintiff's needs, but because the defendants sincerely
> and honestly believed that they were required to comply with the [] policy . . . and that
> applying this policy was, in [the]plaintiff's case, medically justifiable.

*Id.* at 404.  The Second Circuit continued:

> But we believe that a jury could also reasonably reach the contrary result, namely, that the
> defendants here did subjectively know of, and disregard an excessive risk to, plaintiff's
> health . . . [because] there is conflicting evidence about whether or not the decision not to
> prescribe [the medication] to the plaintiff was, in fact, medically justifiable . . . and . . .
> there is no evidence suggesting that the defendants took any step whatsoever to
> investigate—let alone verify—whether it would be medically appropriate
> . . . to and apply the [] policy in [the plaintiff's] case.

*Id.*

　　　　Similarly, here, Defendants have claimed that they followed the catheter policy outlined

in the Manual.  For example, Lee stated in a deposition that "the policy was that [inmates who

self-catheterize] can receive one [catheter] per day.  And that's what I did."  (Lee Dep. at 70)

Similarly, when asked during a deposition whether he thinks that it's appropriate medical treatment to follow policies for every patient, Acrish responded, "That's all I have to go by at the time, policy." (Acrish Dep. at 80.) Defendants also have contended that they believed the policy to be medically justifiable. For example, Lee stated, "[b]ased on my experience and medical judgment, I do not believe that the re-use method places any patient at greater risk for infection than the single-use method." (*See* Decl. of Chung Lee, M.D. ("Lee Decl.") ¶ 20 (Dkt. No. 228).). Similarly, Acrish stated, "[b]ased on my training and experience, I do not believe there is any increased risk of infection for a patient to follow the re-use method of CIC . . . as long as the patient washes the catheter properly and practices good hand hygiene . . . ." (Decl. of Albert Acrish ("Acrish Decl.") ¶ 41 (Dkt. No. 229).)[4]

On the other hand, as described above, there is conflicting evidence about whether the policy was in fact medically justifiable. *See supra* II.B.1.a. There is also some evidence that Defendants did not take appropriate steps to investigate whether it would be medically appropriate to apply the policy in Plaintiffs' cases. For example, Acrish stated in his deposition:

---

[4] The Court notes that Acrish's testimony regarding his medical opinion of the policy is not entirely consistent. Specifically, Acrish's testimony in his deposition does not clearly reflect whether Acrish truly believed the policy to be medically safe:

Q: Is th[e] process of washing and reusing a catheter safe?

A: That was the policy at the time.

Q: That wasn't my question, sir. Is [washing] and reusing a catheter safe?

Q: Let the record reflect that there has been a substantial pause between my question and the witnesses' answer.

A: I can't say yes or no. So I can't answer the question.

(Acrish Dep. at 65–66.)

Q: Did you view an individualized assessment of [Dickinson's] catheter needs?

A: No.

Q: Did you ask Mr. Dickenson [sic] if he had a history of chronic UTIs?

A: No.

(Acrish Dep. at 76.)  Dr. Sultan also stated that "there are no medical records to support that Defendants assessed Plaintiffs' urine volumes to determine their individual catherization needs." (Sultan Decl. ¶ 63.)  Similarly, Dr. Newman asserts that "[a]dequate frequency of catherization should have been assessed periodically by Plaintiffs' medical providers, especially when UTIs were reoccurring.  This was not done."  (Newman Decl. ¶ 44.)  Dr. Newman also states that Defendants should have "assess[ed] the catherization techniques including the catheter cleaning method prescribed to the Plaintiffs once the [UTIs] recurred and other catheter-associated complications developed. . . . This was not done by the Defendants and caused Mr. Knight and Mr. Dickinson to suffer."  (*Id.* ¶¶ 45–46.)  *See Griffin v. Amatucci*, 611 F. App'x 732, 734 (2d Cir. 2015) (genuine dispute of material fact existed as to the defendant doctor's mental state where he "did not review [the plaintiff's] medical records before disregarding the contrary recommendation of [the plaintiff's treating physician"); *Richardson v. Corr. Med. Care, Inc.*, No. 17-CV-420, 2021 WL 6775905, at *13 (N.D.N.Y. Jan. 14, 2021), *reconsideration denied sub nom. Richardson v. Fricke*, 2021 WL 4134761 (N.D.N.Y. Sept. 10, 2021). (finding that "a reasonable juror could infer that [the] [d]efendant [doctor] acted recklessly not only by failing to do more based on his observation during the two visits he had with [the plaintiff], but by also failing to examine [the plaintiff's medical file, which indicated further issues.").  Thus, the Court finds that there is a genuine dispute of material fact exists for this prong as well.

c. Proximate Causation

 "For any claim brought under 42 U.S.C. § 1983, the plaintiff must establish that the defendant's misconduct was the proximate cause of the plaintiff's injury."  *Arnold v. Geary*, 981 F. Supp. 2d 266, 269 (S.D.N.Y. 2013), *aff'd*, 582 F. App'x 42 (2d Cir. 2014).  To satisfy this requirement, Plaintiffs must show that the "[D]efendants' deliberate indifference was a substantial factor leading to the denial' of their [constitutional] right[s] . . . ."  *S.W. ex rel. Marquis-Abrams v. City of New York*, 46 F. Supp. 3d 176, 200 (E.D.N.Y. 2014) (quoting *Doe v. New York City Dep't of Soc. Servs.*, 649 F.2d 134, 141 (2d Cir. 1981)).

Defendants argue that "Plaintiffs cannot establish that re-using catheters was the proximate cause of their UTIs," particularly because "Knight and Dickinson continued to have UTIs even after they started following the single-use method of CIC, with Dickinson suffering as many as <u>nine</u> UTIs from April 2019 to August 2020."  (Defs.' Mem. at 24 (emphasis in original).)  However, both of Plaintiffs' experts opine that "the reuse of single-use catheters, the lack of supplies and the failure of Defendants to independently assess the needs of the Plaintiffs led to their injuries."  (Pls.' Opp'n at 23.)

Specifically, Dr. Sultan found:

In these particular circumstances, with these particular Plaintiffs, there is no question the reuse of catheters led to preventable and recurrent urinary tract infections and the traumatic catheterizations suffered by the Plaintiffs.  Given the infection history of Mr. Knight and Mr. Dickinson, forcing them to reuse catheters with suboptimal supplies and in a suboptimal environment created an obvious and substantial risk of increased infections for which any medical provider would have known or should have known.

(Sultan Decl. ¶ 67.)  Dr. Sultan also explained why he suspected that Dickinson's number of UTIs did not drastically improve after he stopped reusing catheters:

Mr. Dickinson's prior traumatic catheterizations, false passages, and testicular inflammation cause[d] by inadequate catheters and supplies predisposed him to a higher likelihood or future infections. . . . Had Mr. Dickinson not been provided with more catheter

supplies in 2019, there is a good likelihood that he would have continued to suffer from even more frequent infections.

(*Id.* ¶ 65.)  Similarly, Dr. Newman stated: "In my opinion, derived from my review of the above noted records of Mr. Knight [] and Dickinson, the multiple catheterization-related complications experienced by these t[wo] gentlemen was caused by poor professional oversight of [intermittent self-catheterization] and a lack of adequate catheter supplies needed to prevent catheter-associated complications."  (Newman May 2021 Expert Report at 6.)  Dr. Klein, on the other hand, stated:

> Based on my experience as a clinician, I have not seen any increased incidence of UTIs in my patients with neurogenic bladder who reuse 'single use' catheters as compared to patients who use a new catheter with each catheterization.  Rather, in my experience, the incidence of UTIs in my patients who self-catheterize prelates primarily to how often they empty their bladders and not whether they reuse catheters."

(Klein Expert Report at 6.)

As the Court discussed *supra*, summary judgment is inappropriate when there is a battle of the experts.  *See, e.g.*, *Smith v. City of New York*, No. 12-CV-4922, 2015 WL 4643125, at *5 n.6 (S.D.N.Y. Aug. 5, 2015) ("We cannot resolve this 'battle of the experts' at summary judgment."); *In re Refco Inc. Sec. Litig.*, No. 07-CV-8663, 2011 WL 13243784, at *16 n.21 (S.D.N.Y. Mar. 28, 2011) (declining to grant summary judgment because of a battle of the experts).  Thus, the Court finds that a genuine dispute of material fact exists as to proximate causation, rendering summary judgment inappropriate on this claim.

### 2. PLRA Exhaustion

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This "language is 'mandatory':

An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 578 U.S. 632, 638 (2016). This requirement applies to "all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), "regardless of the relief offered through administrative procedures," *Booth v. Churner*, 532 U.S. 731, 741 (2001). Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison grievance system holds out, and doing so properly . . . . Proper exhaustion demands compliance with a prison grievance system's deadlines and other critical procedural rules." *Williams v. Correction Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (alterations, citations, and quotation marks omitted); *Hall v. Annucci*, No. 19-CV-5521, 2021 WL 4392526, at *4 (S.D.N.Y. Sept. 24, 2021) (same).

To exhaust their administrative remedies, prisoners "must exhaust all levels" of DOCCS's "Inmate Grievance Program" ("IGP"). *Little v. Mun. Corp., City of New York*, No. 12-CV-5851, 2017 WL 1184326, at *11 (S.D.N.Y. Mar. 29, 2017). The IGP provides for a three-step grievance process. *See* 7 N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R."), § 701 et seq.; *see also Abdallah v. Ragner*, No. 12-CV-8840, 2013 WL 7118083, at *2 (S.D.N.Y. Nov. 22, 2013) (noting that "[DOCCS] provides an administrative remedy for many prisoners' claims," which is "a grievance system available to prisoners in custody at state prisons" (citing 7 N.Y.C.R.R. § 701.1(c))). Under the framework used in typical cases, an inmate must first file a complaint at the facility where the inmate is housed within 21 calendar days of an alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). Once filed, the representatives of the Inmate Grievance Resolution Committee ("IGRC") have up to 16 calendar days to resolve the grievance informally. *Id.* § 701.5(b)(1). If the matter is not satisfactorily resolved, the IGRC conducts a hearing to either answer the grievance or make a recommendation to the superintendent, *id.* § 701.5(b)(2)(i),

which is scheduled within 16 days after receipt of the grievance, *id.* § 701.5(b)(2)(ii).  The

second step in the tripartite framework is for the grievant or any direct party to appeal the IGRC's

decision to the prison superintendent within seven calendar days after receipt of the IGRC's

written response, although the appealing party can seek an exception to the time limit. *See id.* §

701.5(c)(1).  The third and final step is to appeal the superintendent's decision to the Central

Office Review Committee ("CORC"), which the prisoner must do within seven days of the

superintendent's written response to the grievance.  *Id.* § 701.5(d)(1)(i). Here, too, an inmate may

request an exception to the time limit.  *See id.*  "[O]nly after CORC has reviewed the appeal and

rendered a decision are New York's grievance procedures exhausted."  *Gardner v. Daddezio*, No.

07-CV-7201, 2008 WL 4826025, at *2 (S.D.N.Y. Nov. 5, 2008).

However, the PLRA contains one "textual exception to mandatory exhaustion."  *Ross,*

578 U.S. at 642.  "Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of

administrative remedies: An inmate, that is, must exhaust available remedies, but need not

exhaust unavailable ones."  *Id.* (alteration in original).  Available "grievance procedures . . . are

capable of use to obtain some relief for the action complained of."  *Id.* at 642 (quotation marks

omitted).  In *Ross*, the Supreme Court provided "three kinds of circumstances in which an

administrative remedy, although officially on the books, is not capable of use to obtain relief."

*Id.*  The Supreme Court explained that an administrative remedy is unavailable when: (1) "it

operates as a simple dead end—with officers unable or consistently unwilling to provide any

relief to aggrieved inmates"; (2) "an administrative scheme might be so opaque that it becomes,

practically speaking, incapable of use.  In this situation, some mechanism exists to provide relief,

but no ordinary prisoner can discern or navigate it"; or (3) "prison administrators thwart inmates

from taking advantage of a grievance process through machination, misrepresentation, or

intimidation." *Id.* at 642–43.  The Second Circuit has noted "that the three circumstances discussed in *Ross* do not appear to be exhaustive," but has declined to "opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use." *Williams*, 829 F.3d at 123 n.2.

Defendants argue that "Plaintiffs cannot assert claims for insufficient catheters and supplies based on conduct that pre-dates by more than 21 days their first grievances complaining about these issues."  (Defs.' Mem. at 32.)  Specifically, they note that "Knight filed his first grievance complaining about an insufficient number of catheters and supply of swabs, lubricant, and gloves on July 27, 2018," and "Dickinson filed his first grievance complaining about an insufficient number of catheters on April 18, 2018."  (*Id.*)[5]

Plaintiffs first respond by suggesting that the three-step exhaustion requirement "has been nullified by the Second Circuit in light of the woefully inoperable and ineffective [i]nmate [g]rievance systems in this state."  (Pls.' Opp'n at 29 (citing *Hayes v. Dahlke*, 976 F. 3d 259 (2d Cir. 2020) and *Dickinson v. York*, 828 F. App'x 780 (2d Cir. 2020).)  Regardless of whether the inmate grievance systems in New York State are operable or effective, the Second Circuit has not nullified the exhaustion requirement.  *See, e.g.*, *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 81 –83 (2d Cir. 2021) (dismissing action for failure to exhaust administrative remedies when the incarcerated plaintiffs failed to take any of the three steps in the IGP); *Lev v. Thoms*, 853 F. App'x 767, 769 (2d Cir. 2021) (affirming district court's decision to grant summary judgment to the defendants based on the plaintiff's failure to exhaust his administrative remedies).  The cases

---

[5] The Court notes that Knight filed his first grievance related to catheter supplies on December 9, 2014, when he requested antibacterial soap.  (*See* Morrison Decl. Ex. 15 ("Knight Grievance Dec. 2014") (Dkt. No. 239-15).)

that Plaintiffs cite are inapposite.  In *Hayes v. Dahlke*, 976 F.3d 259 (2d Cir. 2020), the Second

Circuit held that "an inmate exhausts administrative remedies when he follows the procedure in

its entirety but the CORC fails to respond within the 30 days it is allocated under the

regulations."  The Second Circuit applied the same reasoning in *Dickinson v. York,* 828 Fed.

App'x 780, 783 (2d Cir. 2020).  Thus, contrary to Plaintiffs' assertion, the Second Circuit did not

nullify the entire process.  With that in mind, the Court will address Knight and Dickinson's

grievances separately.

### a. Knight

Knight first filed a grievance on December 19, 2014.  (*See* Morrison Decl. Ex. 15 (Knight

Grievance Dec. 2014); *see also* Cunningham Decl. Ex. B (Dkt. No. 232-2).)  In the grievance,

Knight requested antiseptic liquid soap with which to wash his catheters.  (Knight Grievance

Dec. 2014).  In this grievance, Knight mentioned that he previously "wrote a letter to the

facility's doctor to rectify the matter," but he did "not receive any response."  (*Id*.)  The

grievance was denied; Knight appealed, and the appeal was also denied.  (*Id.*)  The appeal states

that "it is not necessary to wash catheters in antibiotic soap.  The DOCCS Infections Control

Manual recommends washing them with warm, soapy water."  (*Id.*)

Knight filed a second grievance on July 27, 2018, requesting four to five catheters,

swabs, gloves, and lubricants per day.  (*See* Morrison Decl. Ex. 16 ("Knight Grievance July

2018") (Dkt. No. 239-16).)  Knight noted that he needed the additional supplies "to prevent the

ongoing urinary tract infections I have been experiencing since the start of the usage of one

catheter per[] day."  (*Id.*)  The grievance was denied, and Knight appealed. The appeal was

accepted in part.  (*Id.*)  The appeal decision, which was issued on October 30, 2019, notes that

"the grievant's complaint has been reviewed by the Division of Health Services' staff who advise

that a complete investigation was conducted and that the grievant is receiving appropriate treatment.  It is noted that he receives [six] straight catheters per day." (*Id.*)  However, according to Knight, he did not receive six catheters per day until December 2018, when the DOCCS policy changed and eliminated catheter re-use.  (Pls.' 56.1 ¶¶ 202–03.)

On August 15, 2018, Knight filed a third grievance.  (Morrison Decl. Ex. 17 ("Knight Grievance Aug. 2018") (Dkt. No. 239-17).)  Knight requested that Lee follow the recommendation of the urology specialist see saw in the AMC, who suggested that Knight be provided with six catheters per day.  (*Id.*)  He also requested six swabs, lubricants, and gloves per day.  (*Id.*)  The grievance was "accepted to the extent adequate medical care is being provided."  (*Id.*)   Lee made a handwritten note in the investigative file, which is dated August 25, 2018, noting that the catheters were "out of stock" and that they "ordered the supply," but that they "don't know how soon the supply [will] come."  (*Id.*)   Lee also noted that he will "find it out on 8-28-18, [and] [Knight] will get 4 catheters [per] day very soon."  (*Id.*)  Knight appealed, noting that his specialist recommended six catheters per day.  (*Id.*)  Knight's appeal was accepted in part.  (*Id.*)  The appeal decision notes that Knight "is currently prescribed [six] catheters per day."  (*Id.*)

Knight argues that his grievances sufficiently put Defendants on notice of the alleged wrongdoing.  (*See* Pls.' Opp'n at 31–32.)  On the question of sufficient notice, the Second Circuit has held:

> As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming. . . .  Uncounseled inmates navigating prison administrative procedures without assistance cannot be expected to satisfy a standard more stringent than that of notice pleading.

*Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004).  "Moreover, a claim may be exhausted when it is closely related to, but not explicitly mentioned in an exhausted grievance."  *Colon v. New York State Dep't of Corr. & Cmty. Supervision*, No. 15-CV-7432, 2019 WL 5294935, at *7 (S.D.N.Y. Oct. 17, 2019) (quotation marks omitted); *see also Simmons v. Robinson*, No. 07-CV-7383, 2011 WL 31066, at *4 (S.D.N.Y. Jan. 4, 2011) (same) (citing *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir. 2009)).  "At bottom, the question is whether plaintiff's grievance sufficiently alerted prison authorities that he was alleging some wrongdoing."  *Peters v. Huttel*, No. 15-CV-9274, 2019 WL 6619602, at *9 (S.D.N.Y. Dec. 5, 2019) (quotation marks removed).

 Knight argues that his December 2014 grievance, in which he requested antibacterial soap, gave Defendants sufficient notice of alleged wrongdoing—the failure to provide multiple single use catheters.  (Pls.' Opp'n at 30.)  This is because, as Plaintiffs argue, "solutions might have included giving him antibacterial soap, or giving him more sterile catheters so he was not introducing bacteria into his body."  (*Id.*)  The Court agrees.  This is a situation where the grievance "sufficiently alerted prison authorities that he was alleging some wrongdoing" *Peters*, 2019 WL 6619602, at *9, and "provide[d] enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures."  *Johnson*, 380 F.3d at 697.

Moreover, this case can be distinguished from those cited by Defendants.  In *Colon*, "[n]othing in the [the plaintiff's grievance] suggests that [the] [p]laintiff ever complained of his injuries to [the defendant doctor] or any other [correctional facility] employee and was ignored or received an inadequate response."  *Colon*, 2019 WL 5294935, at *9.  The plaintiff in that case also testi[fied] that the allegations contained in [the grievance] did not concern the [specific] conduct of [the defendant doctor] that is the subject of the amended complaint" *Id.*  Further, the

court in *Colon* found that the contents of the plaintiff's grievance would not "trigger any investigation into the deliberate indifference of [correctional facility's] medical staff." *Id.* at *10. Here, by contrast, Knight's 2014 grievance states that he did in fact complain about the lack of sufficient catheters and related supplies to Lee and other medical staff.  Knight writes in his grievance that he spoke with a nurse about antiseptic liquid soap and "wrote a letter to the facility's doctor to rectify the matter." (Knight Grievance Dec. 2014.)  And unlike in *Colon*, Knight testified about the same issue that he complained about in his grievances and in the SAC—the lack of sufficient catheters and related supplies.  (*See generally* Knight Dep.)  Finally, Knight's case can be distinguished from *Colon* because his grievance triggered an investigation of the correct issue—in the denial of Knight's appeal, it includes a reference to the DOCCS policy, indicating that an investigation into the facility's medical staff's treatment of Knight was undertaken.  (*See* Knight Grievance Dec. 2014.)

The only other case Defendants cite to in support of their argument (other than the cases simply laying out the exhaustion standard) is *Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004). The Court notes at the outset that, as a Fifth Circuit decision, *Johnson* is not binding on this Court.  It can also be distinguished from the present case.  In *Johnson*, the court held that the plaintiff's claims relating to certain incidents were not exhausted because the plaintiff either did not file or failed to appeal a grievance.  *Id.* at 519.  The *Johnson* court also highlighted the purpose behind this rule: allowing the claims to proceed would "frustrate the prison system's legitimate interest in investigating complaints while they are still fresh." *Id.*  In contrast, as discussed, Knight filed and appealed a grievance in December 2014, and that grievance triggered an investigation into his complaint.  (*See* Knight Grievance Dec. 2014.)

b. Dickinson

On March 9, 2018, Dickinson filed a grievance in which he complained about multiple medical issues and requested, inter alia, "new catheters."  (Dickinson Grievance Mar. 2018.)  The grievance was "accepted to the extent noted" in the response.  (*Id.*)  Regarding catheters, the response noted that Dickinson "is provided two new catheters and two tubes of lub[ricant] [per day]."  (*Id.*)  Dickinson appealed, and the appeal was accepted in part.  The CORC "recommend[ed] that he address[] any further medical concerns to medical staff via established sick call procedures."  (*Id.*)

On April 16, 2018, Dickinson filed a grievance requesting more than the two catheters per day that he was being provided.  (Morrison Decl. Ex. 20 ("Dickinson Grievance Apr. 2018") (Dkt. No. 239-20).)  The grievance was denied, citing the Policy.  (*Id.*). Dickinson appealed, noting that that the "answer by the Superintendent goes against every medical professional I've come in contact with in the past 28 year[s] of being in a wheelchair."  (*Id.*)  Dickinson's appeal was accepted in part, though it notes that "CORC has not been presented with sufficient evidence of improper care or malfeasance by staff and advises him to address medical concerns via sick [call] for the most expeditious means of resolution."

Dickinson filed a third grievance on September 5, 2018, requesting four catheters per day instead of one.  (Morrison Decl. Ex. 19 ("Dickinson Grievance Sept. 2018") (Dkt. No. 239-19).)  The grievance was denied.  (*Id.*)  The denial cited Dickinson's medical chart, which "indicates that he should be receiving 14 catheters per week.  The grievant's signature indicates he received the correct amount of supplies."  (*Id.*)  Dickinson appealed, writing, "I do not receive 14 catheters per week!" (*Id.*) (emphasis in original).  The appeal was accepted in part.  (*Id.*)  CORC again found "insufficient evidence of improper care or malfeasance by staff and advise[d] him to

address further medical concerns via sick call at his current facility for the most expeditious means of resolution."  (*Id.*)

Unlike Knight, Dickinson did not file an earlier grievance that could have given notice to Defendants.  However, Dickinson's case is similar to *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004), despite Defendants' argument to the contrary.  (Defs.' Mem. at 34 n.11.)  In *Abney*, the plaintiff:

> [R]epeatedly obtained favorable rulings on his grievances through the IGP.  He adequately pleads that defendants never implemented the rulings by furnishing properly fitted orthopedic footware.  As DOCS regulations do not provide a mechanism to appeal such implementation failures, the only remedy reasonably available was the filing of another grievance alerting the IGRC and Superintendent to the need for compliance. [The plaintiff] did just that.  And, each time [the plaintiff] received favorable rulings from the IGRC and the Superintendent.

*Abney,* 380 F.3d at 669.  Similarly, Dickinson filed three grievances requesting more catheters per day.  Each time, on appeal, the grievance was accepted in part.  And each time, the CORC recommended that Dickinson address his concerns via sick call.  However, Dickinson alleges that he repeatedly raised his concerns with his medical providers, and nothing was done.  Specifically, Dickinson stated during his deposition:

Q: Who did you speak to [at Shawangunk]?

A: All the nurses.

Q: What did they respond to you?

A: Same answer.

Q: When you say same answer, [you mean] speak to your medical provider?

A: Yes.

Q: And the same with Green Haven, did you speak to any DOCSS staff at Green Haven about how to prevent UTIs?

A: Yes.

Q: Who did you speak to?

A: The nurses.

Q: What did they say?

A: Refer to your medical provider.

Q: At either Shawangunk or Green Haven, did you actually bring this up to your medical provider?

A: Every time I saw them.

Q: When you asked your medical providers about how to prevent a UTI, what were there responses?

A: I know that Acrish said that's policy.  Dr. Lee, I couldn't understand.  Nothing was ever increased.  If anything it was decreased at Shawangunk.

Q: Just for clarification, when you asked them how to prevent a UTI, their response was that's policy?

A: How to prevent a UTI?

Q: Yes.

A: How to prevent a UTI was not to reuse catheters. Really that's the only way.

Q: Is that something you brought up to your providers at Shawangunk or Green Haven?

A: Yes.

(Morrison Decl. Ex. 3 ("Dickinson Dep.") at 67–68 (Dkt. No. 239-3).)  Like the plaintiff in

*Abney,* Dickinson was "was mired in a Catch–22."  *Abney,* 380 F.3d at 667.  In other words, the

process operated as a "dead end."  *Ross,* 578 U.S. at 643.  The circular nature of his attempts to

address his concerns "rendered administrative relief 'unavailable' under the PLRA."  (*Id.*)

Thus, the Court finds that there are material disputes of fact about whether Plaintiffs

exhausted their administrative remedies as required under the PLRA.

<u>3. Qualified Immunity</u>

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks omitted).  Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable officer in Defendants' position would have believed his or her conduct would violate the asserted constitutional right.  *See Pearson*, 555 U.S. at 236 (*overruling Saucier v. Katz*, 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first").  The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (second alteration in original) (citations and quotation marks omitted).  Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id*. at 665 (citations and quotation marks omitted).  Otherwise

stated, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

"First, it is axiomatic that the right that [P]laintiff[s] assert[]—namely, [their] right under the [Eighth] Amendment to be free from cruel and unusual punishment as a result of a deliberate indifference to serious medical needs—is clearly established." *Bradway v. Town of Southampton,* 826 F. Supp. 2d 458, 475 (E.D.N.Y. 2011) (citing *Estelle*, 429 U.S. at 104–05 and *Kaminsky v. Rosenblum*, 929 F.2d 922, 926 (2d Cir. 1991)). And, "for a right to be clearly established for purposes of a qualified immunity defense, the precise conduct at issue need not previously have been ruled unlawful." *Zahrey v. Coffey*, 221 F.3d 342, 357 (2d Cir. 2000); *see also Brandon v. Royce,* No. 16-CV-5552, 2019 WL 1227804, at *10 (S.D.N.Y. Mar. 15, 2019) (same).

"Second, as described above, the Court has found that genuine issues of material fact preclude the Court from determining as a matter of law that this clearly established right was not violated. Thus, the critical question is whether it was objectively reasonable for the individual defendants to believe that they were not committing such a violation." *Bradway,* 826 F. Supp. 2d at 475. And, if "[a] jury could infer deliberate indifference to [Plaintiffs'] serious medical needs[,] . . . [Defendants are] not entitled to qualified immunity because it would not be objectively reasonable for [them] to believe [their] conduct did not violate [Plaintiffs'] rights. *Hathaway v. Coughlin*, 37 F.3d 63, 69 (2d Cir. 1994). Indeed, where, as here, "the objective reasonableness of an officer's actions depends on disputed facts, summary judgment based on qualified immunity is properly denied." *Ruggiero v. Canfield*, No. 14-CV-00307A, 2020 WL

7631890, at *12 (W.D.N.Y. Nov. 9, 2020), *reconsideration denied*, 2020 WL 7625179

(W.D.N.Y. Dec. 22, 2020) (finding qualified immunity inappropriate where genuine issue of

material fact existed on the plaintiff's deliberate indifference to medical needs claim); *see also*

*Harrison v. Barkley*, 219 F.3d 132, 140 (2d Cir. 2000) (finding qualified immunity inappropriate

where the court denied summary judgment for deliberate indifference to medical needs claim);

*Cummings v. Paterson*, No. 12-CV-618S, 2021 WL 2550821, at *15 (W.D.N.Y. June 22, 2021)

("Summary judgment on qualified immunity grounds is not appropriate when there are facts in

dispute that are material to a determination of reasonableness.") (quoting *Thomas v. Roach*, 165

F.3d 137, 143 (2d Cir. 1999)); *Rodriguez v. Mercado*, No. 00-CV-8588, 2002 WL 1997885, at

*13 (S.D.N.Y. Aug. 28, 2002) ("[B]ecause there are factual issues which must be resolved in

order to determine whether similarly-situated officials would have understood that their actions

violated [the plaintiff's] constitutional rights, neither [defendant] is entitled to summary

judgment on qualified immunity grounds."); *Brandon*, 2019 WL 1227804, at *11 (finding

qualified immunity inappropriate on Plaintiff's Eighth Amendment claim where "there are

genuine issues of material fact regarding whether it was objectively reasonable for [the

defendant] to believe that his action did not violate [the] law").

     Plaintiffs persuasively argue that Defendants define the issue too narrowly.  That is,

Defendants define the constitutional right at issue as the right to be free from having "to wash

and reuse catheters for no more than a single day," (Defs.' Mem. at 28), whereas Plaintiffs define

it as a prohibition on "prison officials from being deliberately indifferent to an inmate's serious

medical needs."  (Pls.' Opp'n at 25.)  Indeed, "[t]here is undoubtedly a clearly established right

to be free from deliberate indifference to serious medical needs."  *Hardy v. City of New York*,

732 F. Supp. 2d 112, 138 (E.D.N.Y. 2010) (citing *LaBounty v. Coughlin*, 137 F.3d 68, 74 (2d

Cir. 1998) and *Estelle*, 429 U.S. at 104); *see also Pusateri v. City of Dunkirk*, No. 20-CV-00427, 2021 WL 3160768, at *13 (W.D.N.Y. July 27, 2021) ("[A] right to adequate medical care is clearly established."); *cf. Davis v. Collado*, No. 16-CV-7139, 2018 WL 4757966, at *18 (S.D.N.Y. Sept. 30, 2018) ("[I]n other Eighth Amendment cases courts in the Second Circuit have held that prisoners 'undoubtedly' had a right to be free from various forms of cruel-and-unusual punishment."). That right includes freedom from prison officials "intentionally interfering with [prescribed] treatment." *Estelle*, 429 U.S. at 105. Moreover, the Second Circuit has held that "a conscious choice by DOC[C]S to prescribe easier and less efficacious treatment plan for prisoners violates the Eighth Amendment." *Brock*, 315 F. 3d at 167 (2d Cir. 2003) (quotation marks omitted).

Additionally, it is worth noting that the Second Circuit has applied this reasoning to cases similar to this one, denying qualified immunity where prison doctors reflexively relied on a policy in providing treatment to inmates. For example, in *Griffin v. Amatucci*, the Second Circuit rejected the qualified immunity defense where "the record before [the court] indicate[d] that [the defendant doctor] never reviewed [the plaintiff's] medical records prior to denying his request for a humidifier, and on these facts, without more, a reasonable jury could conclude that [the doctor's] reflexive application of his no-humidifier policy in the face of a contrary recommendation by [the plaintiff's] treating physician was not objectively reasonable." 611 F. App'x 732, 735 (2d Cir. 2015); a*ccord McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) (denying qualified immunity at motion to dismiss stage where officers relied on a prison policy rather than individualized treatment). "Because qualified immunity presents a mixed question of law and fact, . . . these same facts would need to be resolved by the trier of fact before the court can decide whether, as a matter of law, Defendants are entitled to qualified immunity on the

claim." *Ruggiero*, 2020 WL 7631890, at *12 (citing *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018)).

Therefore, Defendants are not entitled to qualified immunity at this time.

<u>III. Conclusion</u>

For the reasons discussed above, Defendants' Motion for Summary denied.  The Clerk of Court is respectfully directed to terminate the pending Motion (Dkt. No. 225.)

SO ORDERED.

DATED:       March 30, 2022
                  White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE